## STATE v. LAWRENCE ALLEN DORSETT.

(Filed 21 November, 1956.)

**1. Kidnapping § 2: Robbery § 3—**

Evidence in this case as to the identity of defendant as the person who, from the back of the car, pointed a pistol at the prosecuting witness, who was driving the vehicle, forcing the witness to drive to a designated place and to leave the car in the possession of defendant, who thereafter took a bag of money from the vehicle, *is held* sufficient to be submitted to the jury both on the charge of kidnapping and of robbery with firearms. G.S. 14-39, G.S. 14-87.

**2. Criminal Law § 32d—**

Where the State fails to introduce evidence of the breeding, training or proven qualities of a dog used by a witness in trailing defendant, but the court excludes all testimony as to the activities of the dog, and instructs the jury not to consider the testimony of the witness that he was running with a bloodhound, but that they might consider the testimony that the man found had with him a bag similar to the bag with the stolen money, etc., exception to the statement of the witness that he had a bloodhound with him on the day in question cannot be sustained.

JOHNSON, J., not sitting.

APPEAL by defendant from *Olive, J.,* at April 1956 Term, of CATAWBA.

Criminal prosecution upon two bills of indictments, Numbers 94 and 95, charging defendant with the crimes of kidnapping and of robbery with firearms, respectively,—consolidated for trial upon motion by defendant.

Defendant pleaded not guilty.

Upon the trial in Superior Court the State offered evidence taken in the light most favorable to the State, tending to show substantially the following narrative as summarized in brief of the Attorney General:

The evidence for the State discloses that on the early morning of the 7th of October, 1954, Jacob E. Baker, Manager of the Dixie Home Grocery Store in Hickory, went to the bank and secured approximately $2,700.00 to be used at the store that day for the purposes of making change and carrying on other business. He left the bank, went out to his car, and placed the money in a cloth bag on the seat beside him. As he drove down the street, he heard a noise in the back of the car. As he looked back, he noticed the whole back seat was being pushed forward toward him and a gun was being pointed in his face. He could not recognize the holder of the gun, but he was instructed by the person in the back seat to push the rear-view mirror up as far as it would go and to drive down the Taylorsville Road out of town. Under the instructions of the voice from the rear seat, Baker drove on several streets

of the town and finally crossed the Catawba River into Caldwell County. During all this time, a running conversation was carried on between Baker and the person in the rear of his car. He was cautioned not to try to signal to anyone, to drive slow, and to act like nothing was happening. He continued to drive the car for several miles on various roads in Caldwell County, and, when they reached the village of Double Shoals, Baker was ordered to stop the car, leave the motor running, get out, and leave the bag of money on the seat. He jumped out of the car, ran behind an old house, and, in a short time, called the police officers. While driving out of Hickory and down the road into Caldwell County, Baker managed to extract the folding money from the bag and kick it under the front seat with his feet. At no time did he actually see the person in the back seat of the car. However, when the man was finally arrested and charged with the crime, Baker very definitely identified the voice of the person arrested as the voice of the person who was in the back seat of his car and who had kidnapped and robbed him. Baker testified: ". . . I had not seen Mr. Dorsett when I heard his voice and it had been some 15 months since then that I heard him again. I still say, to the best of my belief it is the same voice; I had never been under such an ordeal. I did not say positively—absolutely but to the best of my knowledge, and I do not think I shall ever forget it . . . but I am sure it is the same voice." The next time Baker saw his automobile was at the Police Station in Hickory. The cross bars from the trunk to the back seat had been torn out to the extent that there was an opening from the trunk into the back seat of Baker's car. When the car was found by officers, the money which Baker had kicked under the front seat was intact. The bag containing the change was not in the car. As a result of Baker's call to the police, a search was made for Baker's car and for his assailant. One Marvin McGuire, a prisoner at the Taylorsville Prison Camp, was called to help in the search. He testified that he took a bloodhound, which he customarily used in chasing escaped prisoners, to the place where Baker's car was found and, from there, a trail was followed across two mountains. An objection by defendant's counsel to the use of bloodhound evidence was sustained, and the witness was instructed to simply tell where he went. As he went over the mountain and down into the valley, he came across a house and got a drink of water. He then resumed his search. Here again, an objection by counsel for the defendant to bloodhound evidence was sustained. McGuire testified that, as he resumed his search, he came upon the defendant lying on the ground eating some jelly. McGuire grabbed a shotgun which was lying there beside the defendant. Also on the ground beside the defendant was a money bag. As McGuire was questioning the defendant about the gun and money bag, the defendant pulled out a pistol and disarmed McGuire. The defendant then

ordered McGuire to take the money bag on his shoulder and proceed as instructed. As they started off, the dog started barking and the defendant ordered McGuire to kill the dog. McGuire refused to do so, and the defendant took a knife and stabbed the dog between the two front legs—killing it. After the defendant killed the dog, he marched McGuire for about 45 minutes until they came to a ravine. Here McGuire grabbed the gun of the defendant and threw him over into the ravine. He threw the money bag into another ravine nearby and ran for help. McGuire went with officers back to the ravine the next morning and found the money bag. He gave a description of the defendant to officers, and, after looking at a lot of pictures presented to him, he finally identified one as that of the defendant. As a result of the identification by McGuire, officers discovered that he had been living in Hickory in an apartment owned by a Mrs. Newell, but were advised that he had left town. As a result of information furnished officers by the F. B. I., the defendant was found to be living in Fayetteville. He was arrested and brought to Hickory where he was confronted by McGuire who definitely identified the defendant as the man he had found in the woods with the gun and the money bag. Upon being identified by McGuire as the man who killed his dog, the defendant did not deny it. A short time later, upon advice of counsel, the defendant did deny that he was the man involved.

Defendant, reserving exception to the denial of his motions made when the State first rested its case for judgment as of nonsuit as to each count in each bill, offered evidence tending to support his plea of not guilty.

Then the State offered evidence in rebuttal.

At the close of all the evidence defendant renewed his motions for judgment as of nonsuit, to the denial of which he excepted.

Verdict: Guilty as charged in both cases.

Judgment in each case: That defendant be confined in the State Prison at Raleigh for a period of not less than five nor more than eight years,—the two sentences to run concurrently.

Defendant excepted thereto, and appeals to Supreme Court and assigns error.

*Attorney-General Patton and Assistant Attorney-General Bruton for the State.*

*George D. Hovey and Nance, Barrington & Collier for Defendant Appellant.*

WINBORNE, C. J. The record and case on appeal show twenty-four assignments of error, in none of which, after careful consideration, is prejudicial error made to appear.

Assignments 14 and 16 based upon exceptions of like number are directed to denial of defendant's motions aptly made for judgment as of nonsuit. However, taking the evidence offered upon the trial in Superior Court, as summarized hereinbefore, in the light most favorable to the State, it is abundantly sufficient to take the case to the jury and to support the verdict returned by the jury on which judgments were rendered. Even counsel for defendant, while contending in their brief that the evidence offered by the State amounted to no more than a scintilla, say: "True it was a scintilla from which an inference of guilt might possibly be inferred . . ."

In this connection, the statute relating to kidnapping, G.S. 14-39, provides, in pertinent part, that "it shall be unlawful for any person . . . to kidnap . . . any human being . . . " And the word "kidnap" as defined by Webster, means "To carry (anyone) away by unlawful force or by fraud, and against his will, or to seize and detain him for the purpose of so carrying him away." See *S. v. Witherington,* 226 N.C. 211, 37 S.E. 2d 497.

And the statute relating to robbery with firearms, G.S. 14-87, declares in pertinent part that "Any person or persons who, having in his possession or with the use or threatened use of any firearms or other dangerous weapon, implement or means, whereby the life of a person is endangered or threatened, unlawfully takes or attempts to take personal property from another . . . shall be guilty of a felony . . ."

By means of several assignments of error appellant undertakes to show prejudicial error in respect to the bloodhound which the witness McGuire had with him on the day of the alleged crime, when he found defendant with bag of money. However, a perusal of the case on appeal reveals that the trial judge sustained objections to evidence as to activities of the dog, and the record fails to show that defendant made request, at the time, for any special instruction. But the record does show that in the charge to the jury the court, at request of counsel for defendant, gave this special instruction:

"2. I further charge you that when you come to consider the testimony of the witness, Marvin McGuire, you may not consider the evidence indicated by the use of a bloodhound. This, under the law, does not connect the defendant with the crime. There has been no evidence as to the breeding, training, or proven qualities of the so-called bloodhound. The State has introduced evidence that the man found in the woods eating jelly had with him a bag similar to the bag which contained the stolen money; this you may consider along with the fact that the amount of money it contained was approximately the same as the amount contained in the bag which was stolen, but you may not give any more credit to the testimony of Marvin McGuire because he

said he was running with a bloodhound than had he stated or testified he was running with a foxhound."

And it is noted here that some assignments of error fail to show the basis for exception, and hence are not in compliance with the Rules of this Court. Nevertheless error is not made to appear. Indeed the case was fairly submitted to the jury upon a charge free from error.

In the trial below, we find

No error.

JOHNSON, J., not sitting.