[Crim. No. 4327.   Second Dist., Div. Two.   Oct. 10, 1949.]

THE PEOPLE, Respondent, v. HARRY J. HIGHT et al.,
Appellants.

Richard C. Fildew for Appellants.

Fred Howser, Attorney General, and Stanford D. Herlick, Deputy Attorney General, for Respondent.

MOORE, P. J.—From a conviction of kidnapping defendants demand a reversal of the judgment on the grounds of (1) insufficiency of the evidence, (2) its inconsistency with the jury's implied findings and (3) the improbability of its truth.

## The Evidence Is Sufficient

The evidence adopted by the jury established that about 12:15 a. m., of a morning in May, 1948, appellants were engaged in operating games of chance in the city of Compton. Some 15 persons were present in the old barn gambling hall when a group of bandits swooped down upon and robbed them, taking from appellants about $2,300. During the criminal performance one Jerald Jenkins, complaining witness herein, while suffering a nosebleed asked a robber to assist him to blow his nose so that he might breathe; also he pleaded for the return of his long cherished silver dollar. Compliance with these requests created a suspicion in the minds of appellants that Jenkins was there as the "finger man"* for the desperadoes and their subsequent movements were inspired by that suspicion.

Forty feet south of the gambling hall stood another barn used for bedding horses. Upon arrival Jenkins had parked his truck next to the barn and could from the driver's seat observe the gambling house and its front entrance. Other automobiles were parked near by. Jenkins testified that after the robbery Hight ran to some point south of the gambling house and returned with a revolver. Appellants and Jenkins entered an automobile and attempted to overtake the fleeing brigands.

Having returned from their vain pursuit, the men speculated upon the identity of the marauders as Jenkins gathered up his billfold, bankbook and scattered papers. Suddenly, as he started toward his truck, Hight approached, accusing him of having knowledge of the thieves and demanded to know their names. At this juncture the landlord of appellants heard Dunn accuse Jenkins of "fingering" the robbery. As he was denying knowledge of the bandits, Hight jammed something into Jenkins' back as Fairbairn flanked him on the right and Dunn followed in the rear. Dunn said: "You had better keep moving," as one of the trio pushed Jenkins toward the barn which he entered. There they vehemently demanded that he "better start spilling." To his disclaimers of knowledge of the midnight visitors, Fairbairn said, "You had better

*Advance lookout.

start talking . . . if you don't you're going on a ride you're not coming back on. How would you like to go to the river bed? I guess we're going to have to start working." As Jenkins remonstrated, Dunn said, "Let's go. Start walking towards that door." When Jenkins stated that he was going home, Hight said, "You are not going home; you're going for a ride; come on." At that command the three men closed in on their prisoner and escorted him to an automobile. Hight jammed something against his back as he ordered, "Get in the car." By reason of his fear of the men, Jenkins occupied the rear seat with Fairbairn to his right while Hight sat to the right of Dunn who drove. They proceeded over principal thoroughfares and by devious turns until they had reached a remote dirt road paralleling the riverbank. On Hight's command Dunn stopped in a weed patch a short distance from a principal highway. Jenkins testified that during the ride Hight held a "38" revolver in his hand on the back of the seat. Dunn extinguished the lights and shut off the motor. As the two men on the right disembarked, Hight handed the revolver to Fairbairn who ordered Jenkins to leave the conveyance. The latter testified that Fairbairn pointed the gun at him and moved the barrel "upward and downward." When the marksman commanded his victim to back further into the high weeds Jenkins replied, "If you're going to shoot me, you might as well shoot me now." When the gun fired, Jenkins in attempting to flee struck the front of the car with his left side. This turned him around enabling him to witness the "muzzle flaming" as it was held by Hight.* As Jenkins, terrified by succeeding shots, fled through the darkness he was unaware of his wounded arm until he had fallen over a clod. He made his way to a house on the boulevard immediately after the three men had driven by in the unlighted car. The occupants of the home called the police. When the ambulance arrived, six minutes after his collapse, Jenkins was bloody, his clothes were torn and soiled, his shirt severed in several places. After his removal to a local hospital he was treated for bullet wounds in the upper as well as in the lower left arm.

In the car driven by the miscreants the officers on the same day found a rope, dice, poker chips and a white cloth stained with blood. Hight and Dunn told the officers that when Fair-

---

*All the testimony as to the shooting of Jenkins and the possession of the gun by appellants was by Jenkins and was denied by the three kidnappers.

bairn returned to the automobile one of his fingers was bleeding; that they heard two shots and saw Jenkins running; that they believed Jenkins was one of the bandit gang. Dunn testified that at the holdup Jenkins said he knew one of the robbers; that the $2,300 stolen was his own; that after the first ride he did not suspect Jenkins of having been the "finger man" for the bandits.

He and his two codefendants at the trial denied having accused Jenkins of being in league with the bandits and denied all his testimony as to their possession of a gun and denied having forced him into the barn or into the automobile and denied that they discharged a revolver at the river or turned off their lights. Not only was their denial of all of Jenkins' accusatory testimony sweeping, but they related a fantastic story of how Jenkins left the automobile at his own request, defiantly remonstrated that they should not take him to the police station, and ordered Fairbairn back into the car. They asserted that Jenkins flourished a revolver, a scuffle ensued in which the revolver was discharged and that Jenkins took flight with his gun in hand. However, no firearm had been found on Jenkins by the bandits when they raided the gambling den, he had no opportunity to get one before the ride, none was found on his person when he arrived at the home on the boulevard and the discovery of one in that vicinity was never reported.

A marine testified that he was walking along the boulevard in that vicinity at 1:15 a. m. of the same day and observed an automobile parked some 60 feet from the boulevard with its lights extinguished. After he had gone a short distance he heard a gunshot from the direction of the same parked car and in five seconds four more shots in rapid succession. After he had run some distance the unlighted car passed him.

Conceding the absence of a deadly weapon from the possession of appellants following the holdup, their language and conduct were so severe and savage as to constitute force and threat of force sufficient to put an ordinarily prudent person in fear for his personal safety. Not only did they threaten to take Jenkins for a "ride" from which he would not return, but they closely guarded him and compelled him to enter the motor car, conveyed him to the weed patch in a sparsely settled area and repeated the same demands. Whether he entered the machine voluntarily or not, the jury were entitled to infer from the proof that he was conveyed to the remote spot against his will. (*People* v. *Trawick,* 78 Cal.App.2d 604, 606 [178

P.2d 45].) From the testimony of Jenkins, if believed, an inference of his enforced restraint was unavoidable. (*People* v. *Flores,* 62 Cal.App.2d 700, 703 [145 P.2d 318].) Their threats indicated a malign and vindictive purpose and they had the power to enforce them. He protested accompanying them as long as he thought it reasonably safe to do so and they expelled him from the vehicle in a remote and dismal weed patch with anything but friendly feelings. That appellants had a motive is proved by their belief that Jenkins was a "finger man" for the bandits. They admitted such belief to the officers. These facts fully meet the requirements of the kidnapping statute. (Pen. Code, § 207.) ■ A judgment of guilty derived from sufficient substantial evidence cannot be reversed upon any hypothesis. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) ■ The appellate court must assume the existence of every fact reasonably inferable from the evidence and then determine whether the verdict is supported. (*People* v. *Tom Woo,* 181 Cal. 315, 326 [184 P. 389].) This principle is emphasized where the trial judge has approved the verdict. Also, it is controlling even though the circumstances might be consistent with the innocence of the accused. (*People* v. *Perkins,* 8 Cal.2d 502, 511 [66 P.2d 631].)

## The Verdict Is Consistent With the Findings and With the Evidence

■ That the record may contain much or little evidence contrary to the verdict is not ground for reversal. The judgments in most contested cases are the results of conflicting proofs. It is the function of the trial court to resolve by its findings such conflicts and to enter the required judgment. With properly rejected evidence courts of appeal are not concerned. Where the sufficiency of the evidence is questioned, their sole responsibility is to determine whether the adopted evidence is sufficient. (*People* v. *Newland, supra*; *People* v. *Ohman,* 67 Cal.App.2d 467 [154 P.2d 463].)

■ Appellants contend that they are entitled to a reversal because the finding of their guilt of kidnapping (count three) is inconsistent with the verdicts of not guilty of conspiracy to murder, (count one) and attempted murder (count two). They assert that the verdicts on counts one and two "based upon the *same* evidence directly contradict and conflict with the finding that appellants forcibly transported Jenkins" and that the verdicts of not guilty on the first two counts cannot

be reconciled with their inconsistent finding of guilty on the third count. Such logic is specious. The finding that there was no gun in the possession of appellants when they forced Jenkins into the motor car and while they transported him to the weed patch did not determine contrary to the prosecution a factor that is essential to a case of kidnapping. The kidnapper's possession of a deadly weapon while perpetrating his crime is not an element of such offense. That fact is pertinent to the extent of his punishment only. (Pen. Code, § 3024.)

　　Jenkins did not voluntarily accompany appellants on the fatal ride. He at first resisted their invitation, then yielded when threatened by three resolute men who viciously forbade him to mount his truck, and displayed a unified purpose to abduct him as one of them pressed a hard substance to his back and directed him to enter their car. The jury determined that at the time of the kidnapping each "defendant was not armed with a deadly weapon." While in view of the record such finding shocks the sense of reason, logic and justice, yet possession of such weapon is not an essential of the crime of kidnapping. The jury believed that appellants threatened dire results for Jenkins' noncompliance, that their show of force was ominous and that they actually conveyed him to a locality remote from the barn at which the ride began. Because they did not find any evidence of an agreement to commit murder and because appellants' possession of a gun was not established beyond a reasonable doubt, their determination that Jenkins was forcibly transported is not thereby depreciated. It is at once evident that a total lack of proof of an agreement to commit a murder is not necessarily a finding that the alleged overt act did not occur.

A man may be readily acquitted of murder by reason of the absence of proof of the mental element essential to the establishment of that crime although the act he did may have been admitted by him. Likewise, a group of men accused of conspiracy to commit murder may be exonerated of that charge for lack of evidence of their agreement to kill, while at the same time they may separately have purchased murderous weapons. They might even have by force compelled the alleged victim to drive with them to a lonely spot to settle their differences without a thought of murder. Would they be innocent of kidnapping because at the commencement of their drive no one of them had thought of the more serious offense? In acquitting these appellants of a conspiracy to murder, the

jury did not necessarily intend to find that they did not do the overt acts alleged. It must be assumed that they intended to do exactly what they wrote in their verdicts, namely, to clear appellants of an agreement, conspiracy or confederation and to convict them of kidnapping. Verdicts acquit men of crimes but seldom of the acts alleged. If acquittal of the crime of conspiracy to commit murder were tantamount to an exoneration of the alleged overt act, there would be no virtue in section 954 of the Penal Code which specifically provides that an acquittal on one count is not to be deemed an acquittal on any other count. (Pen. Code, § 954; Fricke's Cal. Crim. Law (2d ed.), p. 143.)

The authorities cited by appellants in support of their second proposition are not apropos. (See *People* v. *Koehn,* 207 Cal. 605 [279 P. 646] ; *In re Johnston,* 3 Cal.2d 32 [43 P.2d 541] ; *People* v. *Novo,* 12 Cal.App.2d 525, 526 [55 P.2d 915].) Koehn had been convicted of attempted murder and malicious use of explosives. The former was reversed because it was inconsistent with the finding that in placing the bomb near the judge's residence defendant intended merely to intimidate—not to destroy. The Novo and Johnston cases are each distinguished by facts that the conviction of acts alleged in one count was inconsistent with verdict of acquittal of the same acts which were alleged in a separate count. Novo was accused in two counts, (1) of entering a dwelling in the nighttime with intent to commit rape, (2) of assaulting a woman not his wife by means of force and violence to accomplish sexual intercourse with her. Although both charges arose out of the same transaction the accused was found guilty of burglary under count one and of simple assault under count two. That part of the judgment based upon the finding of a simple assault was held void and stricken and the conviction of burglary was affirmed because it was "amply supported by the record." Verdicts are not inconsistent unless they are rendered upon charges wherein the elements of the offenses alleged are identical. (*People* v. *Doxie,* 34 Cal.App.2d 511, 512 [93 P.2d 1068].) There is no identity of findings (1) that A conspired with B to kill C and (2) that A and B kidnapped C. Neither is there a conflict in the findings (1) that A and B did not conspire to kill C and (2) that A and B kidnapped C.

The Penal Code provides (§ 954) that different offenses arising out of the same circumstances may be charged, election is not required, and acquittal of one or more counts shall not

be deemed an acquittal of any other count. (See *People* v. *Amick*, 20 Cal.2d 247 [125 P.2d 25], wherein it was held that involuntary manslaughter and negligent homicide were not identical.)

In the Johnston case the defendants were indicted in 13 counts for selling corporate stock in nonconformity with the Corporate Securities Act [Stats. 1917, p. 673; 2 Deering's Gen. Laws, Act 652], and in a 14th count of conspiring to violate the provisions of the act in furtherance of which they committed certain overt acts which were identical with the crimes charged in the preceding counts. They were convicted of the conspiracy and acquitted of all the other 13 counts. It was held that because the specific controls the general, the court was without jurisdiction to pronounce a judgment on the conspiracy count.

### THE EVIDENCE IS NOT IMPROBABLE

■ Appellants argue that the evidence is improbable because (1) Jenkins alone testified that Fairbairn and Hight shot at him, (2) the paraffin test on such appellants taken on the morning of their arrest was negative, (3) Jenkins' first ride with appellants was voluntary and free of threats, (4) he did not attempt to leave the machine when it stopped for signals, (5) there is no evidence of Jenkins' resistance to the demands that he accompany them, (6) Hight's car as well as Jenkins' truck were at the barn, (7) Jenkins was impeached. Such matters were solely for the jury if there was any substantial proof of them. The testimony of Jenkins was potent evidence of the facts recited in the early part of this discussion. ■ The paraffin test was not determinative since it was not shown that Hight and Fairbairn had not previously washed their hands with a cleaning solvent. ■ That Jenkins remained silent and that his silence was induced by fear of appellants were questions answered by the jury. His testimony as to his fears cannot be rejected by the reviewing court merely because to some persons his behavior might have appeared unusual. (*People* v. *Klinkenberg*, 90 Cal.App.2d 608, 626 [204 P.2d 47, 613]; *People* v. *Newland*, 15 Cal.2d 678 [104 P.2d 778].) His fear of the men was a natural emotion and his conduct was discreet in not attempting to escape from three stern, indignant men who were suspecting him of complicity in the offense which had caused their loss. (*People* v. *Flores*, 62 Cal.App.2d 700, 702 [145 P.2d 318].) As to the jury's finding that appellants had no pistol while

they kidnapped Jenkins the only consistent view thereof is that the jury intended to declare that it had not been proved beyond a reasonable doubt that appellants possessed a gun.

The attempt to impeach Jenkins adds virtue to his testimony. If there is any merit in the seven arguments of appellants listed in the preceding paragraph, the jury had additional cause to accept them as they listened to the bludgeoning of the only witness to testify to the truth of the crime charged. While the impeaching evidence was depreciated by the animus or self-interest of the witnesses, yet, conceding to the fullest measure the sincerity and adequacy of the impeaching witnesses, the jury is not required to disbelieve the narrative of a witness merely because he may have been shown to be devoid of all sense of honor, truth and integrity. He may be competent though degraded; he may be believed though unworthy; he may report the truth accurately though contradicted by others. It is the function of the jury to appraise his utterances and to record their value. (See *People* v. *Cox,* 66 Cal.App. 287, 293 [226 P. 14].)

Finally, the approval of the verdict by the trial judge who saw, heard and evaluated the accused and their accuser leaves little to be said. No assignment is made of any ruling as erroneous. They rest their appeal upon the record and upon the court's denial of a new trial.

The judgment and the order denying the motion for a new trial are affirmed.

McComb, J., and Wilson, J., concurred.

A petition for rehearing was denied October 19, 1949, and the following opinion was then rendered:

THE COURT.—Appellant Dunn seeks a rehearing of the judgment of affirmance herein on the ground that after two days' deliberation the jury was permitted to ''go out and view the scene.'' This point was not presented at the original hearing. It would be just as well had it never been mentioned. The court made the order pursuant to stipulation of the parties for the jury to inspect the premises after a verdict had been signed following two days' deliberation.

Appellant's (Dunn) petition for a hearing by the Supreme Court was denied November 7, 1949.