112 So.2d 910 (1959)
Maurice CHAVIGNY, Appellant,
v.
STATE of Florida, Appellee.
Nos. 594, 595.
District Court of Appeal of Florida. Second District.
May 27, 1959.
Rehearing Denied June 10, 1959.
*911 Maurice Chavigny, in pro. per.
Richard W. Ervin, Atty. Gen., and George R. Georgieff, Asst. Atty. Gen., for appellee.
KANNER, Chief Judge.
The jury found appellant guilty of murder in the second degree under two indictments charging him with the first degree murder of Wilbur McReynolds, hereinafter referred to as "the General," and his wife, Faye McReynolds. The court sentenced him to life imprisonment on each of the convictions, the sentences to run consecutively, and the appellant has entered a separate notice of appeal from each conviction and sentence. These appeals were consolidated for consideration by this court.
The testimony reveals briefly that the appellant, Maurice Chavigny, a Frenchman in this country on a temporary visa, had *912 been staying with the McReynolds couple for about two years, and that on April 3, 1957, General and Mrs. McReynolds were shot to death in the living room of their home in St. Petersburg.
It was agreed by the state and the appellant and approved by the court that the two cases under which Chavigny was indicted be tried together. His attorneys perfected the appeals to this court except that Chavigny prepared his own briefs, both main and reply, after he became dissatisfied with his counsel. After appellant evinced his discontent, his counsel made an application for withdrawal, in which appellant joined, and this was granted by this court.
In Chavigny's appeals there are seven assignments of error. The effect of the first three is that the verdicts are contrary to the law and the evidence. Numbers four, five, six, and seven assign, respectively, as errors of the court: the adjudging of appellant as guilty of second degree murder; the sentencing of appellant to life imprisonment; the sentencing of Chavigny so that the sentences imposed were to run consecutively rather than concurrently, thereby imposing cruel and inhuman punishment; and the admitting into evidence of the confession signed by appellant, since no proper predicate had been laid for its introduction, and since no sufficient prior prima facie proof of corpus delicti had been established. Based upon these assignments, the appellant questions the convictions as to the sufficiency of the evidence, as to the propriety of the court's action in admitting his confession, and as to the sentences imposed.
The version of the events which transpired at the McReynolds home on the evening of April 3, 1957, as shown through the testimony of the state's witnesses, is sharply in conflict with that of appellant. The state's version is here presented first so that appellant's answer to it may be shown in his recital as it appears through the record. Chief among the state's witnesses were certain near neighbors of the McReynolds couple and several police officers who investigated the crimes.
The neighborhood witnesses resided at distances of from 40 to 138 feet from the McReynolds home and knew them and Chavigny. Skeletonized, the overlapping testimony of certain of these neighbors is to the effect that on the fatal evening they heard coming from the McReynolds home a loud, shouting voice identified by them as Chavigny's. Three of them watched and listened from the sidewalk in front of the McReynolds home for five to ten minutes, from which point they saw the General standing in the living room, arms folded across his chest in a characteristic posture, and presently heard Chavigny's voice saying, "Don't move, don't move," shortly hearing the additional words, "You have been playing with me, darling, now se fini, se fini." Within two or three minutes they heard several shots ring out in rapid succession, after which they could see the General no more. They then observed the lights being dimmed in the McReynolds home and saw a figure identified as Chavigny's moving about the house. Soon they saw a flashlight beam move away from the McReynolds home and shortly return, saw the McReynolds Cadillac being backed from the garage rapidly and speeding down the street with police officers firing after it.
One neighbor, Creitz, testified that on the evening of the slayings he heard some one cry, "No, no," and heard some shots fired, following which he observed a figure on a bicycle leaving then returning to the McReynolds home, saw the car backed from the garage and driven rapidly away with the police shooting after the retreating vehicle.
Testimony of certain of the police officers who investigated the shooting bore out that of the neighbor witnesses as to the retreating car and the shots fired after it by three of the policemen. Found in the Florida room of the McReynolds home after the shooting were nine empty .22 caliber long rifle shells. There was the *913 further testimony that a pistol purchased by Chavigny on April 3 was a .22 caliber revolver having a nine shell capacity and that along with it he also bought a box of fifty shells. The officers who apprehended Chavigny testified that they stopped him at gunpoint, pulled him from the car, and handcuffed him as he was lying on the ground, and that they recovered a pistol from the McReynolds car which contained five live .22 caliber long rifle shells.
The pathologist who performed autopsies on the bodies testified that three bullet points of entry were found in the body of Mrs. McReynolds and five in that of the General, that Mrs. McReynolds' body showed evidence of injuries inflicted shortly before death resulting in certain cuts, bruises, and two broken bones in her right wrist.
Appellant's confession, admitted into evidence by the court, repudiated by Chavigny during the trial, and dealt with later in this opinion, related that he shot and killed both the General and Faye McReynolds. This is revealed from the following excerpt of the confession:
"Q. Were you in the living room when you shot him? A. Yes.
"Q. Then you went and used the phone?' A. Yes. When I shoot Fay, the General was in his room and he came out of the room. It is an old love story  I don't know if you understand that."
Appellant's story unfolded mainly through his own testimony, since he was the only witness on his behalf. This testimony was partially in his own words and partly through a court interpreter used during the trial. He testified that his relationship with Mrs. McReynolds was the cause of "a lot of dispute and quarrels between the husband and wife" and that he had decided to leave. On April 3, he said, determining that he would end his own life, he had gone downtown and bought a bicycle, a gun, and a box of shells and returned to the McReynolds home at about 7:30 p.m.; that the couple then had a big argument, the first he had known them to have; that after a time, having left the room because he did not wish to become involved in the difficulty, he, among other things, donned his French military uniform and, gun in pocket, returned to the living room and told the McReynoldses he was leaving; and that Mrs. McReynolds remonstrated, saying, "I love you very much." Chavigny said he told Faye, "I am going, it is finished, you pray for me, darling;" and, telling her that he was going to commit suicide, tried then and there to do so but she directed his hand away. Then McReynolds shot Faye and directed the gun toward Chavigny, whereupon appellant shot the General, he stated.
After shooting the General, Chavigny related, he left the house on his bicycle but returned to get another gun, the General's because the gun which he had bought and taken with him when he left on the bicycle failed to function when he pulled the trigger two or three times in a suicide attempt. Chavigny related that he then removed the shells from the General's gun, loaded his own pistol with them, took both guns, and proceeded in the McReynolds automobile down a boulevard to a small bridge where he threw McReynolds' gun into the stream. This he did, he explained, believing that if he committed suicide in the McReynolds automobile he would thereby in the eyes of the public absolve the General and his wife of blame and such blame would instead be directed at himself. He explained that he did not then attempt suicide because he figured his gun still was not functioning.
Chavigny urges that the shouting heard by the neighbors was between the McReynoldses during the course of their argument with each other and that the neighbors could not possibly have heard him shouting, since the only words spoken by him during the entire time after he returned to the McReynolds house were, upon first returning, to tell the General to stop fighting Faye, then later, when he re-entered the *914 living room, to say to Mrs. McReynolds, "I am going, it is finished, and you pray for me, darling."
In support of his contention that the testimony is insufficient to support his convictions of second degree murder, appellant declares, in the main, that had there been an examination of the General's gun, it could have been established that it had recently been fired; that the evidence against himself was chiefly hearsay based upon narratives of people who had discussed the matter among themselves; that the words which the witness Creitz said he heard, "No, no," were not claimed to have been heard by the other neighborhood witnesses, although they were at a closer point of audibility than was Creitz; that this was illogical and inconsistent; and that testimony of the medical examiner showing injuries suffered by Faye shortly before death could have indicated that these wounds were inflicted by the General during the course of his argument with Faye.
That the appellant shot the General, then, is not disputed, although he claims this was done in self-defense and because the General had shot Faye McReynolds. Chavigny denies that he, himself, shot Mrs. McReynolds.
After a careful study of the record in its entirety by this court, we may here point out that the testimony, other than that of the appellant through his own totally unverified account of the events involved, supports the state's charge that Chavigny shot and killed both General McReynolds and his wife, Faye. Multiple details related by the witnesses bear this out, including the significant testimony as to appellant's loud, angry voice, the only voice heard during the affair; the words shouted by Chavigny on the fatal evening, ominous in their portent; the General's posture and position as clearly visible to three neighborhood witnesses throughout the latter portion of the affray until the shots had been fired; and Chavigny's flight in the face of police command to stop and police fire, followed by his enforced apprehension. Then there is the complete absence of any showing, other than appellant's assertions, that the General had on his person or used a gun; there is also the finding in the Florida room of the McReynolds home of nine empty .22 caliber long rifle shells and in the pistol recovered from the automobile in which appellant fled five live shells of the same caliber as those purchased by Chavigny that day. These elements set forth by the record are bolstered by appellant's confession.
As to the confession signed by appellant and later repudiated, Chavigny contends that he felt he had been intimidated by Lieutenant Lee, to whom he made the statement and gave the confession, because he claimed the latter told appellant that if he did not give Lee a statement, he would put him in jail and keep him there indefinitely; that he also felt that if he gave the statement, he would be allowed his freedom. He did not dispute that he had signed the confession nor that he had told police officials that he wanted to tell them about the matter; nor does he claim that he was mistreated.
The court cautiously, in the absence of the jury, questioned Officer Quilligan, who gave most of the testimony concerning the confession. Further, the court heard the testimony of several other witnesses on the subject of the confession, all of which supported that of Quilligan to the effect that the confession was given freely and voluntarily, that nothing was done or said to put appellant in fear nor to furnish him any promise or hope of benefit or reward for his confession or statement. The court also heard testimony to the effect that Chavigny read the statement before he signed it and that Officer Quilligan had gone over "each question and each answer with him individually to be sure he understood what had been asked and to be sure the answers was as he wanted to give it." The corpus delicti was clearly established during the course of the trial before the *915 confession was permitted to be introduced into evidence.
The court fully and correctly charged the jury as to confessions, instructing them as to their duty in considering the credibility of a confession and telling them that all confessions should be acted upon with great caution and that if they should find that the confession had been freely and voluntarily given, they should consider it along with the other facts and circumstances, but that if they determined it was not freely and voluntarily given, they should totally disregard it and not consider it.
Appellant has also raised the contention that the two life sentences as imposed by the court to run consecutively were excessive and constituted cruel and inhuman punishment. However, the applicable law refutes this position. Under section 782.04, Florida Statutes, F.S.A., murder in the second degree is defined as one perpetrated by an act imminently dangerous to another, evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual. The penalty for murder in the second degree is prescribed as being imprisonment in the state prison for life, or for any number of years not less than twenty years. The maximum penalties were imposed as permitted by this statutory provision.
The appropriate rule is enunciated in the case of Brown v. State, 1943, 152 Fla. 853, 13 So.2d 458, at page 461. The Florida Supreme Court points out that where the objection is to the particular sentence and not to the statute under which it was imposed, a sentence is not cruel nor unusual if such sentence is in conformity to the limit fixed by the statute and is therefore valid, notwithstanding its apparent harshness or severity. The rationale of this rule is that the constitutional prohibition, F.S.A.Const. Declaration of Rights, § 8, refers to the statute fixing the punishment and not to the punishment set by the court within the limits enunciated in such statute; that if the statute does not violate the Constitution, then any punishment set in conformity to it cannot be adjudged excessive for the reason that it is not within judicial but legislative power, controlled only by the constitutional provisions, to declare what punishment may be assessed against those convicted of crime. See also Walker v. State, Fla. 1950, 44 So.2d 814. Additionally on this subject the Supreme Court, in the case of La Barbera v. State, Fla. 1953, 63 So.2d 654, stated that if a trial judge imposes a sentence which is within the limits defined in the statute denouncing the offense, further relief by way of reducing the term is a matter purely within the province of the parole authorities. Just recently, by opinion filed February 25, 1959, the Supreme Court again voiced its adherence to this principle in the case of Stanford v. State, Fla. 1959, 110 So.2d 1.
The instructions to the jury were fair and complete. The appellant received a just and impartial trial, and the evidence abundantly supports the verdicts and sentences.
Affirmed.
ALLEN and SHANNON, JJ., concur.