## STATE v. GLENN E. BRUCE.

(Filed 28 September, 1966.)

**1. Criminal Law § 91—**

The admission of testimony of a statement made by defendant during the assault to the effect that it did not matter what defendant did to his victims since defendant was being sought in another state for murder, *held* not prejudicial when the court immediately withdraws the statement and instructs the jury to dismiss it from their minds, since it must be presumed that the jurors are men of character and sufficient intelligence to understand and comply with the instruction withdrawing the evidence.

**2. Kidnapping § 2—**

In a prosecution for kidnapping accomplished by intimidation and threats, a statement made by defendant to his victim during the assault that it did not make any difference what he did to her since the law was seeking him for murder in another state, is competent to show intimidation and the inducing of fear in his victim.

**3. Kidnapping § 1—**

Kidnapping is the unlawful taking and carrying away of a person by force and against his will; the use of actual physical force or violence is not necessary, it being sufficient if there be threats and intimidation and appeals to the fear of the victim which are sufficient to put an ordinarily prudent person in fear of his life or personal safety and to overcome his will.

**4. Criminal Law § 71—**

The interpretation placed by the U. S. Supreme Court upon the Due Process Clause of the Fourteenth Amendment of the Federal Constitution is controlling in determining the competency of an alleged confession by defendant.

**5. Same—**

The trial court's findings of fact supporting its conclusion that the confession offered in evidence was voluntarily and knowingly made will not be disturbed on appeal when the findings are supported by competent evidence and the findings support the conclusions of law.

**6. Same— Evidence held sufficient to support finding supporting conclusion that confession was voluntary.**

Defendant made the statement offered in evidence while he was being transported by officers from the scene where he had wrecked his vehicle in an attempt to evade the officers. The evidence on the *voir dire* was to the effect that the officers warned him that, in view of the seriousness of the offense with which he was charged, he should not make any statement until he had contacted an attorney, that he was advised that he was entitled to counsel and that if he were an indigent the State would furnish counsel, and that defendant made the incriminating statement in the normal conversation upon interrogation only in regard to his identity and where he was going, etc. *Held:* The evidence supports the conclusion that the confession was voluntarily and knowingly made and that none of defendant's constitutional rights were violated, and the admission of the confession in evidence was not error.

**7. Kidnapping § 2—**

Under G.S. 14-39 the court may impose a sentence of life imprisonment for kidnapping.

**8. Constitutional Law § 36—**

Punishment within the statutory maximum cannot be cruel or unusual in the constitutional sense.

**9. Same;   Criminal Law § 131—**

The imposition of sentence of life imprisonment upon conviction of the offense of kidnapping, the sentence to run consecutively after sentence of life imprisonment theretofore entered in a prosecution of defendant for rape, is not cruel or unusual punishment and is not forbidden by constitutional provisions.

APPEAL by defendant from *Morris, E.J.,* 7 March 1966 Criminal Session of NEW HANOVER.

Criminal prosecution upon an indictment charging defendant on 23 September 1964 with force and arms at and in New Hanover County with unlawfully, wilfully, feloniously, and forcibly kidnapping one Betty Jean Phipps, a violation of G.S. 14-39.

Defendant was represented by court-appointed counsel, Messrs. George Rountree, Jr., and Cicero P. Yow, able and experienced members of the New Hanover County Bar. He pleaded not guilty. The verdict of the jury was guilty.

From a judgment that "defendant be confined to the State Central Prison for the remainder of his natural life; this sentence to run consecutively, and not concurrently, with the sentence imposed in Onslow County at the December 1964 Term of the Superior Court, presided over by Honorable Henry L. Stevens, Jr., in Case No. 5236, in which case the defendant was sentenced upon a charge of rape to prison for his natural life," defendant appeals.

*Attorney General T. W. Bruton and Deputy Attorney. General Harry W. McGalliard for the State.*

*George Rountree, Jr. and Cicero P. Yow for defendant appellant.*

PARKER, C.J.   This is a summary of the State's evidence: About 6:30 p.m. on 23 September 1964 Mrs. Betty Jean Phipps parked a Pontiac Tempest automobile owned by her husband and herself near the Wilmington Public Library at Fourth and Market Streets in the city of Wilmington. In the automobile with her were her two little daughters, one aged five years and the other six and a half years. She and her two daughters got out of the automobile and went into the library. She reads a lot to her daughters, and she came to the library to check out some books. They stayed in the library 15 or

20 minutes. When they came out of the library, it was getting dark. At that time she saw defendant sitting on a little mound in front of the library that marks off the driveway. Her automobile had two doors. She opened the left door, her oldest daughter "crawled in the back," she got in the automobile, and her youngest daughter "crawled across" her. The left door was open. Her oldest daughter screamed. She turned around, and defendant had a pistol "sticking in my neck." Defendant told her if she would do exactly what he said nobody would be hurt. Defendant pushed up the front seat and got in the back seat. He then got in the front seat. She put her daughters in the back seat. Defendant had his pistol in her ribs.

She asked defendant what he wanted, and he replied that he wanted her to drive him to "North 17." She had moved to Wilmington the prior July and did not know where North 17 was, and asked defendant where it was. He replied, "You just drive around and I'll tell you." She drove off from the library because she was afraid he would hurt her two girls and herself, and she kept driving as he directed because she was afraid he would kill them. With defendant holding his pistol in her ribs she drove many miles in and around Wilmington, and finally got on Highway #17 headed to Jacksonville, North Carolina. In Onslow County defendant had her to stop at a filling station, and he bought a small quantity of gasoline. While there defendant had his pistol under his jacket pointed toward her side, and told her not to make a sound and to tell her children to be quiet. She then drove on Highway #17 a short distance and turned off on a dirt road. Defendant had her to stop, took the keys out of the ignition, and ordered her and her children out of the automobile. After they got out, he drove her automobile away. From the time he got in the automobile at the library until they got out, he had the pistol pointed at her ribs at all times, except when one of her daughters spoke and then he would point the pistol at them.

As soon as she saw the tail lights of the car disappear, she and her daughters ran as fast as they could to the highway, and got in a ditch by the highway. She saw lights coming from each direction on the highway, and ran into the highway and "flagged down" the approaching vehicles, which were buses. They got in a bus which carried them to the police station at Holly Ridge. She told the officers what had happened, and gave them the license number of her automobile. They called her husband in Wilmington.

On her cross-examination by Mr. Rountree, she testified: "During most of the ride there was conversation going on. . . . He told me it didn't make any difference what he done to us, that the law was after him in New Jersey for killing somebody up there." Mr. Rountree moved to strike. Whereupon, the court instructed the

jury as follows: "Members of the jury, you need not consider that he said he was wanted in New Jersey for killing someone. Dismiss that from your mind." Defendant did not at this time make a motion for a mistrial, or file any exception.

This is a further summary of the State's evidence: W. B. Richardson, a member of the State Highway Patrol and stationed at New Bern, testified in substance: On the night of 23 September 1964 he was on duty north of New Bern on Highway #17. He received a radio message to be on the lookout for a 1963 Tempest sports coupe, license No. BR-8313. He immediately turned around and proceeded south on Highway #17 to New Bern, and while driving through New Bern he met this vehicle at the intersection of Queen and Broad Streets in New Bern. Broad Street is also U. S. Highway #17. He immediately made a U-turn in the street and followed this vehicle. He pulled up beside the vehicle, turned on the red light on the patrol car, and sounded his siren. Defendant, driving the Pontiac Tempest automobile, saw him and the patrol car, increased his speed and pulled over into Richardson's lane of traffic forcing him to fall back. Defendant increased his speed to 65 or 70 miles an hour in New Bern, and ran through red lights. The street defendant was driving on was a four-lane street. Defendant crossed the median between the north-bound and south-bound traffic, got into the south-bound lane, and was going north in the south-bound lane. The traffic at the time was fairly heavy. As defendant approached the intersection of Front and Broad Streets near the mouth of the Neuse River bridge, he swerved his automobile to avoid striking a sailor in the highway, lost control of his vehicle, skidded up on the curbing, came back to the street in a diagonal skid, and struck a light pole and wrecked. Defendant jumped out of the wrecked automobile and ran down the embankment. Richardson jumped out of the patrol car and gave pursuit. He hollered for defendant to stop and he did, throwing up his hands. Richardson told him he was under arrest. He found about 40 rounds of .22-caliber ammunition in defendant's pocket. By that time several other officers had arrived, and he turned defendant over to them. He searched the wrecked automobile and found in it five boxes of .22 ammunition and a pistol. Defendant was within about 10 to 20 feet of the automobile when he searched it. After he had searched the car, he took the defendant and the pistol and ammunition and proceeded south on Highway #17 to meet officers from Onslow County. Trooper Campbell rode with him. On the way to meet the Onslow County officers he had a conversation with the defendant. He does not remember who started the conversation. He talked with defendant, asked him his name, where he was from, and where he was going. After that defendant started

talking and talked continuously while he was with Richardson. At this point Richardson was asked by the solicitor, "What did he tell you?" The court asked the prosecuting officer, "Is this offered as a purported confession?" The prosecuting officer replied, "Yes." Whereupon, the court asked the jury to retire from the courtroom. In their absence Richardson was examined by Mr. Rountree, of counsel for defendant, and testified as follows:

"I had this conversation with the defendant after he was under arrest and in my patrol car. . . . At that particular time I had ceased to search around for suspects, and the finger of suspicion had come to rest upon the defendant. I did not tell him at that time that he was entitled immediately to representation by counsel, but Trooper Campbell did. I told him I didn't want to hear about the case. Trooper Campbell told him the seriousness, did he realize the seriousness of this charge; and he, Trooper Campbell, advised him to contact an attorney before he did much talking like that.

"I don't say that we advised him in the words as set out, as to his legal rights, but we did tell him he was entitled to counsel, and he made the statement that he had no money to hire counsel. We explained that the State would furnish him one. I did not question him about what had happened, other than where he was going, his name was all I was interested in. I told him I was not the investigating officer, and that he would be turned over to the Onslow County authorities, and that so far as I was concerned, I had no charges other than no operator's license and speeding and reckless driving, and due to the fact that the other charges were greater than mine, that I would not bring charges myself.

"I told him not to say anything. Trooper Campbell told him he'd better not talk until he'd contacted an attorney. That was before we got out of the city of New Bern. As quickly as he started talking we told him not to do it. When he mentioned money, I told him that the State would get him counsel. I said, 'Well, the State will furnish you (counsel).' I even started a conversation not even pertaining to this. In our conversation it so happened he had worked for a man in Whiteville that I knew and I started talking with him about that.

"Trooper Campbell was in the car with me. As I have stated before, Trooper Campbell told him that he had better contact counsel before he started talking and asked him — he said, 'Do you realize the seriousness of this charge?' Trooper Campbell did not ask him any questions, just talk, conversation mostly.

This gentleman here did most of the talking. He talked continuously, almost. I am sure that there were questions asked. In a normal conversation, you would ask a question, and I am sure that some questions were answered, but I don't remember."

After Mr. Rountree had finished his questioning of Richardson, the prosecuting officer questioned Richardson, and in answer to his question Richardson replied:

"In spite of my telling him not to say anything, and in spite of Trooper Campbell telling him he didn't have to say anything, he still wanted to talk. In spite of the fact we tried to change the subject and talk about something else, he came back to this and talked about it."

There is nothing in the record at this point to indicate that defendant desired to testify as to the circumstances under which his purported confession was made or to offer evidence in this respect, and he offered no evidence.

After Richardson had been questioned upon the *voir dire* and defendant had offered no evidence, the court found the statement made by defendant was voluntary in nature and admissible in evidence, overruled the defendant's objection to it, and defendant excepted. Whereupon, the judge had the jury return to the courtroom and seated in the box.

Richardson then testified on direct examination by the State in substance as follows: Defendant stated to him that he had left Whiteville by bus early in the day en route to Wilmington; that he was near a public library and saw a lady come out of the library with two small children; that he stuck a gun in her face and told her that if she would cooperate that the children would not be harmed; that he told her to drive him north on U. S. Highway #17; and that later he put her out in Onslow County and proceeded on in the direction of New Bern in her automobile. He said that at times he would run the car 100 miles an hour. The officers asked him where he was going and he replied, "Nowhere in particular, just all over, most anywhere." At this point defendant moved to strike the testimony of the officer as to what he told him. The court denied the motion, and defendant excepted.

When the State rested its case, the jury was asked to leave the courtroom, and in their absence Mr. Rountree stated to the court that the defendant desired to testify with respect to the voluntariness and admissibility of the alleged confession by him which was testified to by Trooper Richardson and was found to be voluntary by the court, and also with respect to whether he was advised of his

constitutional rights "under the case of *Escobedo*." The court granted
the request. Whereupon, defendant testified on direct examination
by Mr. Rountree in substance as follows: When he was arrested
and Trooper Richardson got the pistol, he put him in the patrol car
to bring him to the Onslow County authorities, and another trooper
got in the patrol car with them. Trooper Richardson asked him, after
the car had started, if he knew what they had him for. He asked
Richardson what could he get for automobile larceny, and Richard-
son informed him that he had not arrested him for automobile larceny.
He asked Richardson what he was wanted for, and Richardson re-
plied that he had arrested him on a charge of rape and asked him if
he knew what he could get for the charge of rape in North Carolina.
He told him no, and Richardson said, "Well, you could get the gas
chamber." Richardson then said: "But you don't have to tell me
anything, because I only arrested you for the Onslow County au-
thorities." He then asked Richardson if he was entitled to a law-
yer, and Richardson replied to him: "Yes, you'll be able to get a
lawyer. If you can't afford one, they'll appoint you one when you
get into Court." That is all Richardson said about that. Then Rich-
ardson started asking questions as to where he had been, what he
had done, and to whom the car belonged. He only remembers
Trooper Campbell as sitting in the car. He and Richardson did the
talking. Richardson did not tell him while they were driving to-
wards Onslow County that he had better keep his mouth shut be-
cause the charge under which he was held was grave and that he
needed a lawyer and ought not to talk before he got one. Richard-
son told him he did not have to say anything because he had only
arrested him for the Onslow County authorities. There was a dis-
cussion, that is all. He did not admit anything to anybody at any
time, except once and that was when he signed a statement under
duress which was proved in the courtroom the last time he was there.
The whole time he was having the discussion with Richardson and
Campbell he was scared to death. He had just got in an automobile
wreck, somebody had told him he was going to die in the gas cham-
ber, and he was not very calm. He does not believe that either
Campbell or Richardson told him he had to tell them anything. He
was scared. Richardson told him that if he went ahead and told them
about it and pleaded guilty, they would give him life but would not
give him the gas chamber. As a result of this statement of going light
with him, getting life imprisonment instead of the gas chamber, he
talked about the charges under which he was then laboring. He
testified on redirect examination: "There was no confession, except
as to the auto larceny and where I had got hold of the gun, and

that was voluntary." He stated on recross-examination: "I wasn't physically mistreated in any way."

After defendant had finished his testimony, the court found from his sworn testimony that upon his being taken into custody by Richardson and in the presence of Campbell the defendant was advised of the charges preferred against him, and by the statement of defendant himself he was admonished not to talk about it because of the seriousness of the charge; that he was advised that he was entitled to counsel and that counsel would be appointed for him. The court further found from the testimony of defendant that his statement to the officers was made voluntarily, without any fear as a result of threats made against him by Troopers Richardson and Campbell; that no physical violence was exhibited toward him, and that whatever he said during the time he was in the custody of Richardson and in the presence of Campbell constituted a voluntary statement; and the court reaffirmed its finding heretofore made that such statement constitutes a voluntary confession, and therefore admitted it in evidence. The defendant excepted.

After that, defendant by Mr. Rountree moved for a mistrial for the reason that Mrs. Betty Jean Phipps testified on cross-examination by him that during the ride from Wilmington to Onslow County defendant told her that "it didn't make any difference what he done to us, that the law was after him in New Jersey for killing somebody up there"; and that although the court advised the jury to dismiss such a statement from their minds, "it is humanly impossible for a jury to disabuse their minds and forget completely that this testimony was given in their presence, and that to permit it would cause prejudicial error."

Defendant cites and relies upon *S. v. Wyatt,* 254 N.C. 220, 118 S.E. 2d 420, and *S. v. Hawley,* 229 N.C. 167, 48 S.E. 2d 35, as authority in point that the judge committed prejudicial error in denying his motion for a mistrial. The facts in these two cases are entirely different from the instant case, in that the impropriety there was the prejudicial argument to the jury by the solicitor prosecuting for the State, and further the court did not instruct the jury to dismiss from their minds the improper argument.

When Mrs. Betty Jean Phipps testified as to what defendant told her about the law being after him in New Jersey for homicide, defendant moved to strike, and the judge promptly instructed the jury not to consider this evidence and to dismiss such evidence from their minds. At that time it would seem defendant's counsel was of opinion that any prejudicial effect such testimony by Mrs. Phipps had upon the jury had been completely removed from the jury's

minds by the judge's allowing defendant's motion to strike and his instruction to the jury to dismiss such evidence from their minds, because at that time defendant did not move for a mistrial or file any exception.

We have held many times that when any improper arguments or improper remarks are made by counsel, and the transgression is corrected immediately by the court, any prejudicial effect is ordinarily removed from the minds of the jury. 4 Strong's N. C. Index, Trial, pp. 298-99, where some of the cases are cited. In *S. v. Ray*, 212 N.C. 725, 194 S.E. 482, the Court said:

> "Whether impressions received by jurors from the words spoken can be effaced by a mental effort, under the direction of the court, may provoke debate in the realm of psychology, but our system for the administration of justice through trial by jury is based upon the assumption that the trial jurors are men of character and of sufficient intelligence to fully understand and comply with the instructions of the court, and are presumed to have done so. *Wilson v. Mfg. Co.*, 120 N.C. 94, 26 S.E. 629."

The judge's denial of defendant's motion for a new trial was proper for two reasons: First, if Mrs. Phipps' testimony of what defendant said to her, "it didn't make any difference what he done to us, that the law was after him in New Jersey for killing somebody up there," was incompetent, which we do not admit, then any prejudice to defendant by such testimony was removed from the minds of the jury by the judge's immediately striking such evidence on defendant's motion, and instructing the jury not to consider it and to dismiss it from their minds. Second, we think the testimony was competent and should not have been stricken. The word "kidnap" in its application to the indictment and to the State's evidence, and as used in G.S. 14-39, means the unlawful taking and carrying away of a person by force and against his will (the common law definition), *S. v. Lowry*, 263 N.C. 536, 139 S.E. 2d 870. The use of actual physical force or violence is not always essential to the commission of the offense of kidnapping, as the word "kidnap" is used in our statute and as it is defined at common law. To hold that the use of actual physical force or violence is necessary would be such a narrow construction of our statute as would render it nugatory in many cases. The crime of kidnapping is frequently committed by threats and intimidation and appeals to the fears of the victim which are sufficient to put an ordinarily prudent person in fear for his life or personal safety, and to overcome the will of the victim and secure control of his person without his consent and against his will, and

are equivalent to the use of actual force or violence. *People v. Hope,* 257 N.Y. 147, 177 N.E. 402; *People v. Hight,* 94 Cal. App. 2d 100, 210 P. 2d 270; *People v. Broyles,* 151 Cal. App. 2d 428, 311 P. 2d 88; *Brown v. State,* 232 Ind. 227, 111 N.E. 2d 808; *State v. Taylor,* 70 N.D. 201, 293 N.W. 219; 1 Am. Jur. 2d, Abduction and Kidnapping, § 13; 51 C.J.S., Kidnapping, p. 435; Stansbury, N. C. Evidence, 2d Ed., § 91.

Defendant further assigns as error the admission in evidence of defendant's confession, "because it clearly violated the defendant's Fifth and Sixth Amendment rights as guaranteed by the Fourteenth Amendment" to the United States Constitution. We have set forth above in minute detail the circumstances under which defendant's confession was made as shown by the State's evidence. We have also set forth in minute detail defendant's testimony in respect thereto and his denial that he confessed kidnapping Mrs. Phipps. This is another in a long line of cases presenting the question as to whether the confession was properly admitted in evidence under the Fourteenth Amendment. It is well settled that "a defendant in a state criminal trial has a right to be tried according to the substantive and procedural due process requirements of the Fourteenth Amendment to the United States Constitution." *Rogers v. Richmond,* 365 U.S. 534, 5 L. Ed. 2d 760; Stansbury, N. C. Evidence, 2d Ed., § 183. It is well-settled law that we are required to accept the interpretation the United States Supreme Court has placed on the due process clause of the Fourteenth Amendment to the Federal Constitution. *S. v. Davis,* 253 N.C. 86, 116 S.E. 2d 365. The trial court's minute findings of fact and his conclusion that the confession was voluntarily made and admissible in evidence will not be disturbed on appeal because his findings are supported by competent evidence and his findings of fact support his conclusion. This rule also obtains in the Federal courts. *S. v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572, 28 A.L.R. 2d 1104; *S. v. Davis, supra;* 1 Strong's N. C. Index, Criminal Law, § 71, Confessions, and Supplement to *ibid.,* Criminal Law, § 71, Confessions. Of course, the conclusions of law to be drawn from the facts found by the trial judge are not binding on the reviewing courts. *S. v. Barnes,* 264 N.C. 517, 142 S.E. 2d 344. The facts in *Escobedo v. Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977, are entirely different from the facts here, and that case does not control. It seems crystal clear from the court's findings of fact which support his conclusion that defendant's confession was entirely voluntary on his part and was admissible in evidence and that none of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United

States Constitution were violated. The court properly admitted the confession in evidence.

Defendant assigns as error that the judgment entered was "cruel and unusual punishment in sentencing defendant to serve a life term after the expiration of a prior life term imposed in a prior rape trial by Judge Henry L. Stevens, Jr., for the rape of the prosecuting witness occurring during the alleged kidnapping." According to the judgment in the instant case, Judge Stevens sentenced the defendant to imprisonment for life for rape at the December 1964 Session of the Superior Court of Onslow County. Defendant was tried in the instant case for kidnapping at the 7 March 1966 Criminal Session of the New Hanover County Superior Court. It seems manifest from the record before us, and from the statement in defendant's brief above quoted, that defendant raped Mrs. Betty Jean Phipps, and it would also seem that he raped her in the presence of her two little children.

Our former statute, C.S. 4221, provided that any person who forcibly or fraudulently kidnapped any person shall be guilty of a felony, and upon conviction may be punished in the discretion of the court, not exceeding 20 years in the State's prison. As a result of the kidnapping and death in the Lindbergh tragedy, the General Assembly of North Carolina repealed C.S. 4221 by the enactment of Public Laws 1933, Ch. 542, now codified as G.S. 14-39, which reads in pertinent part: "It shall be unlawful for any person . . . , male or female . . . to kidnap . . . any human being. . . . Any person . . . violating . . . any provisions of this section shall be guilty of a felony, and upon conviction therefor, shall be punishable by imprisonment for life." The effect of G.S. 14-39, repealing C.S. 4221, is to increase within the discretion of the court the maximum punishment for kidnapping from 20 years to life, and not to make a life term mandatory upon conviction, the intent of G.S. 14-39 to this effect being shown by the use of the word "punishable" in prescribing the sentence. S. v. Kelly, 206 N.C. 660, 175 S.E. 294; S. v. Lowry, supra.

We have held in case after case that when the punishment does not exceed the limits fixed by the statute, it cannot be considered cruel and unusual punishment in a constitutional sense. S. v. Stansbury, 230 N.C. 589, 55 S.E. 2d 185; S. v. Welch, 232 N.C. 77, 59 S.E. 2d 199; S. v. Whaley, 263 N.C. 824, 140 S.E. 2d 305; S. v. Stubbs, 266 N.C. 295, 145 S.E. 2d 899; S. v. Davis, 267 N.C. 126, 147 S.E. 2d 570.

So far as a diligent search on our part discloses, and so far as appears from the briefs of the State and of the defendant, the ques-

tion presented by this assignment of error has not been passed on by this Court. However, we have found a case directly in point decided by the Supreme Court of Errors of Connecticut, *S. v. McNally*, 152 Conn. 598, 211 A. 2d 162 (25 May 1965), *cert. den.*, 382 U.S. 948; 15 L. Ed. 2d 356. In that case two defendants, McNally and McAlister, were convicted in the Superior Court of Fairfield County of two counts of murder in the second degree, and they appealed. The Supreme Court of Errors of Connecticut held that under the statute the court was warranted in imposing consecutive life sentences on the defendants, and that the imposition of such sentences was neither excessive nor cruel and unusual punishment. In its opinion the Court said:

> "The final argument advanced by the defendants is that the sentences constitute cruel and unusual punishment, which is prohibited under the eighth amendment to the federal constitution. When the objection is to the sentence and not to the statute under which the sentence was imposed, the sentence is not cruel or unusual if it is in conformity with the limit fixed by statute. When the statute does not violate the constitution, any punishment which conforms to it cannot be adjudged excessive since it is within the power of the legislature and not the judiciary to determine the extent of the punishment which may be imposed on those convicted of crime. The imposition of life sentences to run consecutively for two second-degree murders is neither excessive nor cruel and inhuman punishment. [Citing authority.] As the sentences imposed did not exceed the permissible statutory penalties, the punishment cannot be held to be cruel and unusual as a matter of law. [Citing authority.]"

The case of *Chavigny v. State* (Fla. App.), 112 So. 2d 910 *(rehearing denied* 10 June 1959), *cert. den.* (Supreme Court of Florida July 1959), 114 So. 2d 6, *cert. den.*, 362 U.S. 922, 4 L. Ed. 2d 742 (1960), is directly in point and in accord with the Connecticut case of *State v. McNally*. A rehearing of the *Chavigny* case was denied 30 April 1964 by the District Court of Appeals of Florida, 163 So. 2d 47. In the *Chavigny* case reported in 163 So. 2d 47, the Court held that the fact that two consecutive life sentences affected any chance defendant convicted of two second-degree murders might have for obtaining a parole did not make imposition of the second sentence improper. See also *Capone v. United States*, 51 F. 2d 609, 76 A.L.R. 1534, *cert. den.*, 284 U.S. 669, 76 L. Ed. 566.

G.S. 14-21 in pertinent part reads as follows: "Every person who

GIBBS v. LIGHT CO.

is convicted of ravishing and carnally knowing any female of the age of twelve years or more by force and against her will . . . , shall suffer death: Provided, if the jury shall so recommend at the time of rendering its verdict in open court, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury." The objection here is to the sentence of life imprisonment to run consecutively with a sentence of life imprisonment for rape, and not to the statute of kidnapping under which the sentence in the instant case was imposed. The sentence of life imprisonment for rape before Judge Stevens and the sentence of life imprisonment in the instant case to run consecutively with the sentence of life imprisonment for rape do not exceed the limits fixed by the statutes, and the sentence in the instant case is not cruel and unusual punishment in a constitutional sense. This assignment of error is overruled.

We have discussed every assignment of error brought forward and discussed in defendant's brief. The defendant does not contend that the State's evidence was insufficient to carry its case to the jury. The State had plenary evidence to carry its case to the jury, without introducing into evidence the confession of the defendant. Defendant does not contend there was any error in the charge.

In the trial we find

No error.