STATE v. JOHN C. LOWRY.

AND

STATE v. MAY MALLORY, RICHARD CROWDER, HAROLD REEP AND JOHN CYRIL LOWRY, DEFENDANTS.

(Filed 29 January, 1965.)

**1. Common Law—**

So much of the common law as is not destructive of, or repugnant to, or inconsistent with, the freedom and independence of the State and which has not become obsolete or superseded by statute is in force in this State. G.S. 4-1.

**2. Criminal Law § 1—**

A criminal statute must be sufficiently definite to give unmistakable notice of the act proscribed, but if the statute uses a well-known common law appellation which conotes a definite offense the statute is definite and certain.

**3. Same; Kidnapping § 1—**

The failure of G.S. 14-39 to define kidnapping does not render the statute vague or uncertain, since the statute does not originate the offense but merely provides that kidnapping should be a felony and fixes the punishment, and the common law definition of the offense as the unlawful taking and carrying away of a person by force and against his will, is incorporated in the statute by construction.

**4. Constitutional Law § 30; Criminal Law § 86—**

A person formally charged with crime is entitled to a speedy and impartial trial under both the Federal and State Constitutions, but such right is a shield to protect a defendant from arbitrary and oppressive delays, and whether a speedy trial is afforded must be determined in the light of the circumstances of each particular case.

**5. Same—**

G.S. 15-10 is for the protection of persons held without bail and does not apply to persons allowed bail.

**6. Same— Defendants were not denied speedy trial under facts of this case.**

One of defendants jointly charged departed the State before she could be apprehended, and continuous effort for extradition was not successful until more than two years thereafter. In the interim the other defendants moved for trial, and at the trial moved for their discharge on the ground that their right to a speedy trial had been violated. *Held:* The absence of the fugitive and her pending extradition were sufficient basis for the denial of the motion for trial, and since the court anticipated from term to term that the fugitive would be returned, there was no abuse of discretion in denying the motion for discharge, there being nothing to show that the delay impaired in any way the abilities of the defendants to present their defenses.

**7. Constitutional Law § 29; Grand Jury § 1—**

The arbitrary exclusion of citizens from service on the grand jury on account of race is a denial of due process to members of the excluded race charged with indictable offenses.

**8. Same—**

A white person who has made common cause with Negroes in their civil rights demonstrations and who is jointly charged with them with an offense committed in connection therewith is entitled to object to the arbitrary exclusion of Negroes from the grand jury returning the indictments.

**9. Same—**

The placing of designations or symbols of race on the jury list is improper.

**10. Same—**

The statutory provisions in this State respecting the qualifications, selection, listing, drawing and attendance of jurors is fair and nondiscrimatory and meets all constitutional tests.

**11. Same—**

A jury list is not discriminatory merely because it is made from the tax lists, although it is a better practice to supplement such lists by resort to voter registrations and other available lists.

**12. Same—**

While there is no requirement of law that Negroes be represented on jury panels in proportion to their ratio to the population, proof of a disproportionately small percentage of Negroes on juries constitutes a *prima facie* showing of discrimination.

**13. Same—**

While the burden of proving racial discrimination in the selection of the jury lists is upon defendants, defendants' *prima facie* showing of discrimination puts the burden upon the State to overcome the *prima facie* case by competent evidence showing the absence of discrimination in fact, and if there is contradictory and conflicting evidence the trial judge must make specific findings in regard thereto.

**14. Same—**

Where defendants make out a *prima facie* case of racial discrimination in the selection of the jury by showing that racial designations were placed on the jury lists and that only a token number of Negroes served on grand juries, merely negative findings by the court of absence of discrimination and the absence of any positive factual showing sufficient to overcome dedendants' *prima facie* case, requires the quashal of the indictments.

**15. Indictment and Warrant § 16—**

Quashal of the indictment for racial discrimination in the selection of the grand jury does not entitle defendants to their discharge or the dismissal

of the charges, since the State may proceed on new bills returned by an unexceptionable grand jury.

APPEAL by defendants from *Brock, S. J.,* February 1964 Mixed Session of UNION.

Defendants May Mallory, John Cyril Lowry, Richard Crowder and Harold Reep are jointly charged in two separate bills of indictment. One indictment charges that on 17 August 1961 they "unlawfully, wilfully, feloniously and forcibly did kidnap one Mabel Stegall . . ." The other indictment is identical except that it charges the kidnapping of G. Bruce Stegall.

The State introduced evidence which we summarize briefly as follows: G. Bruce Stegall and wife, Mabel Stegall, in the afternoon of 27 August 1961, Sunday, left their home near Marshville and motored to Monroe, a distance of 10 miles. About 5:15 P.M. they stopped in front of the Monroe city hall. They learned that earlier that day there had been trouble at the courthouse square between Negroes and whites. "Freedom Marchers" had been picketing the square; there had been disorders and some of the marchers had been taken in custody by the police. Though it was quiet at the time, the Stegalls decided to leave town and drove away, Bruce was driving. While they were proceeding along Winchester Avenue they saw in front of them a crowd congregated in the Avenue. They pulled into Boyte Street and stopped, intending to back out, turn around and go in another direction. Before they could back the car it was surrounded by about 200 people, some of whom had rifles. They were threatened, forcibly taken from the car and removed at gunpoint to the home of Robert Williams, about 100 yards from the car. There Bruce Stegall was required to talk by telephone to the Monroe Chief of Police, inform him they would be held as hostages until the arrested marchers were released, and that their freedom and safety depended on such release of prisoners. Thereafter, the Stegalls were bound and carried to another building, where they remained under guard until they were released sometime between 8:00 and 9:00 P.M. All of the defendants had a part, directly or indirectly, in the taking, removal and restraint of the Stegalls.

The jury found all of the defendants "guilty as charged." Judgment of imprisonment was entered as to each.

*Attorney General Bruton and Deputy Attorney General Moody for the State.*

*Kunstler, Kunstler & Kinoy, Walter B. Nivens and Richard J. Scupi for defendant John C. Lowry.*

*Samuel S. Mitchell and Walter S. Haffner (Good & Haffner) for other defendants.*

MOORE, J.   Defendant Lowry filed a different statement of the case on appeal from that filed by the other defendants, and a separate brief. To avoid needless repetition we discuss the appeals in one opinion. There are many assignments of error; we find it necessary to discuss only three.

## I.

The defendants assert and contend that G.S. 14-39 will not support an indictment and conviction, for that its terms are vague, uncertain, ambiguous, and indefinite "so as to deprive appellants of due process of law as protected by the Fourteenth Amendment of the Federal Constitution" and Article I, section 17, of the Constitution of North Carolina.

In support of this contention appellants quote at length from 14 Am. Jur., Criminal Law, sec. 19, pp. 773-4, as follows: "The Legislature in the exercise of its power to declare what shall constitute a crime or punishable offense, must inform the citizen with reasonable precision what acts it intends to prohibit, so that he may have a certain understandable rule of conduct and know what acts it is his duty to avoid. . . . If a statute uses words of no determinative meaning and the language is so general and indefinite as to embrace not only acts properly and legally punishable, but others not punishable, it will be declared void for uncertainty. It is axiomatic that statutes creating and defining crimes cannot be extended by intendment. . . . A statute that either forbids or requires the doing of an act in terms so vague that men of common intelligence must guess as to its meaning and differ as to its application lacks the first essential of due process of law." This is unquestionably a statement of sound principles. *State v. Hales,* 256 N.C. 27, 122 S.E. 2d 768; *State v. Morrison,* 210 N.C. 117, 185 S.E. 674; *State v. Partlow,* 91 N.C. 550; *Drake v. Drake,* 15 N.C. 110. But from the text cited by appellants we find the following (pp. 774-5) : "A statute is not necessarily void for uncertainty because in creating a crime it does not define the offense, for if the offense is known to the common law, the common law definition may be adopted, even in jurisdictions where there are no common law crimes."

"As a general rule, when an offense is declared by statute in the general terms of the common law, without more particular definition, resort may be had to the common law for the particular acts constitut-

ing the offense. In other words, regardless whether the common law has been abrogated, when a statute punishes an act giving it a name known to the common law, without otherwise defining it, the statute is construed according to the common law definition." 22 C.J.S., Criminal Law, § 21, p. 59; *McAdams v. State,* 81 N.E. 2d 671 (Ind. 1948); *State v. Pratt,* 116 A. 2d 924 (Me. 1955); *State v. Quatro,* 105 A. 2d 913 (N.J. 1954); *State v. Johnson,* 293 S.W. 2d 907 (Mo. 1956). While all federal crimes are created by statute, common-law words used in the statute may take their intended meaning from the common law. *U. S. v. Turley,* 352 U.S. 407 (1957).

Kidnapping was a criminal offense at common law. In North Carolina "all such parts of the common law as were heretofore in force and use . . ., or so much of the common law as is not destructive of, or repugnant to, or inconsistent with, the freedom and independence of this State and the form of government therein established, and which has not been otherwise provided for in whole or in part, not abrogated or become obsolete, are hereby declared to be in full force." G.S. 4-1. The statutes of this jurisdiction relating to kidnapping, insofar as applicable to the instant case, did not originate the offense, they make kidnapping a felony and provide the limit of punishment. Kidnapping was a misdemeanor at common law. 1 Am. Jur., 2d, Abduction and Kidnapping, § 3, p. 161. C.S. 4221 (P.L. 1901, C. 699, § 1) provided that "If any person shall forcibly or fraudulently kidnap any person he shall be guilty of a felony, and upon conviction may be punished in the discretion of the court, not exceeding 20 years in the State's prison." This statute did not define "kidnap"; the common-law definition applied. The common-law definition is stated and explained in *State v. Harrison* (1907), 145 N.C. 408, 59 S.E. 867, as follows:

> "Blackstone and some other English authorities define kidnapping to be the 'forcible abduction or stealing away of a man, woman, or child from their own country and sending them into another.' In 1 East Pleas of the Crown, 429, it is described as 'the most aggravated species of false imprisonment,' and defined to be 'the stealing and carrying away or secreting of any person.' 'The Supreme Court of New Hampshire,' says Bishop, 'more reasonably, and apparently not in conflict with actual decisions, held that transportation to a foreign country is not a necessary part of the offense.' 2 Bish. New Crim. Law, sec. 750. The case referred to is *S. v. Rollins,* 8 N.H., 550, and sustains the author's text. Bishop states the better definition to be 'false imprisonment aggravated by conveying the imprisoned person to some other place.'"

C.S. 4221 was repealed by G.S. 14-39 (P.L. 1933, C. 542), and the limit of punishment increased. The increase in the limit of punishment and enactment of other provisions (not pertinent here) were a direct result of the Lindbergh tragedy. G.S. 14-39 does not define "kidnap," *State v. Witherington, supra;* it provides that "It shall be unlawful for any person . . . to kidnap or cause to be kidnapped any human being . . . Any person . . . violating any provision of this section, and upon conviction thereof, shall be *punishable* by imprisonment for life." This statute leaves the term of imprisonment in the discretion of the court, but increases the maximum term from 20 years to life. *State v. Kelly,* 206 N.C. 660, 175 S.E. 294.

The word "kidnap," in its application to the evidence in the case at bar, and as used in G.S. 14-39, means the unlawful taking and carrying away of a person by force and against his will (the common-law definition). *State v. Gough,* 257 N.C. 348, 126 S.E. 2d 118; *State v. Dorsett,* 245 N.C. 47, 95 S.E. 2d 90; *State v. Witherington,* 226 N.C. 211, 37 S.E. 2d 497; *State v. Harrison, supra.* It is the fact, not the distance of forcible removal of the victim that constitutes kidnapping. 1 Am. Jur., 2d, Abduction and Kidnapping, § 18, p. 172; *People v. Oganesoff,* 184 P. 2d 953 (Cal.); *People v. Wein,* 326 P. 2d 457 (Cal.), *cert. den.,* 358 U.S. 866, *reh. den.,* 358 U.S. 896.

The principles which appellants seek to apply are inapplicable. The word "kidnap" is known to the common law, and the statute is construed according to the common-law definition.

## II.

Defendants Lowry, Crowder and Reep moved for their discharge and the dismissal of proceedings against them, on the ground that their right to a speedy trial had been violated.

The offenses were allegedly committed on 27 August 1961. True bills of indictment were found and returned 31 August 1961, and defendants were brought to trial at the February Session 1964. The above named defendants had moved for trial at the May 1962 term of superior court.

"It is generally the policy of the law that criminal cases be promptly disposed of, . . . and the sixth amendment to the Federal Constitution guarantees to accused in a criminal prosecution under the federal law the right to a speedy trial. While this provision does not apply to criminal prosecutions in the state courts under state laws, the right is generally guaranteed by state constitutional or statutory provisions." 22A C.J.S., Criminal Law, § 467(2), p. 20.

Defendants urgently contend that the speedy-trial guarantee of the Sixth Amendment is applicable to state proceedings under the provisions of the Fourteenth Amendment. But the affirmative of this proposition is not essential to the maintenance of defendants' rights. The fundamental law of this state secures to them the right of speedy trial. In *State v. Patton,* 260 N.C. 359, 132 S.E. 2d 891, this Court declared:

> "The right of a person formally accused of crime to a speedy and impartial trial has been guaranteed to Englishmen since Magna Carta, and the principle is embodied in the Sixth Amendment to the Federal Constitution, and in some form is contained in our State Constitution and in that of most, if not all, of our sister states, or, if not, in statutory provisions. *S. v. Webb,* 155 N.C. 426, 70 S.E. 1064 . . .
>
> "G.S. 15-10, entitled 'Speedy trial or discharge on commitment for felony,' requires simply that under certain circumstances 'the prisoner be discharged from custody and not that he go quit of further prosecution.' *S. v. Webb, supra.*
>
> "The Court said in *Beavers v. Haubert,* 198 U.S. 77, 49 L. Ed. 950, 954: 'The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.'
>
> "The constitutional right to a speedy trial is designed to prohibit arbitrary and oppressive delays which might be caused by the fault of the prosecution. *Pollard v. United States,* 352 U.S. 354, 1 L. Ed. 2d 393; *State v. Hadley,* Mo., 249, S.W. 2d 857. The right to a speedy trial on the merits is not designed as a sword for defendant's escape, but a shield for his protection.

No general principle fixes the exact time within which a trial must be had. Whether a speedy trial is afforded must be determined in the light of the circumstances of each particular case. In the absence of a statutory standard, what is a fair and reasonable time is within the discretion of the court. 22A C.J.S., Criminal Law, § 467(4), pp. 24, 25, 30. "Four factors are relevant to a consideration of whether denial of a speedy trial assumes due process proportions: the length of delay, the reason for the delay, the prejudice to defendant, and waiver by defendant. See Note, 57 Colum. L. Rev. 846, 861-63 (1957). These factors are to be considered together because they are interrelated. For example, even a short delay might constitute a violation of defendant's constitutional right where the defendant is held without bail, and there

is no reason for delay." *United States v. Fay*, 313 F. 2d 620 (C.C.A. 2C 1963).

G.S. 15-10 is for the protection of persons held without bail; it does not apply in the instant case. The movants were released on bail in September or October 1961 and have been at large at all times since. They are indicted jointly with defendant Mallory. Mrs. Mallory departed the State before she could be apprehended, and became a fugitive from justice. She went to Ohio and resisted extradition. The State of Ohio and the State of North Carolina were engaged continuously over a period of about two years in attempting to effect her return to North Carolina. She carried the question of her extradition to the Supreme Court of the United States twice, having litigated the matter through the Ohio State courts and the Federal courts (See: No. 858, Misc., Supreme Court of the United States, October Term, 1962, and No. 324, Misc., Supreme Court of the United States, October Term, 1963). The case came to trial in Union County Superior Court promptly after her return to North Carolina. The absence of defendant Mallory and her pending extradition were the basis of denial of the motion of her codefendants for trial in 1962. The court anticipated from term to term her early return, and had no way of knowing it would require two years. The desire of the prosecution to try defendants together at one trial does not seem unreasonable since they were jointly charged. We note that at the time these defendants were urging trial in 1962 they were also moving for a change of venue which, if allowed, would have required a continuance. There is no evidence in the record tending to show that the abilities of defendants to present their defenses were in any way impaired by the delay. It would seem that the delay constituted a cooling period, which, more likely than not, was a benefit to them. The court committed no abuse of discretion in denial of the motion for discharge and to dismiss. The assignment of error is overruled.

## III.

Defendants moved to quash the indictments on the ground that Negroes had been systematically excluded from service on the grand juries of Union County because of their race, and particularly from the grand jury in service at the time the indictments were found. The motion was made in apt time, before pleading to the indictments. *State v. Covington*, 258 N.C. 501, 128 S.E. 2d 827. After hearing evidence and finding facts the court overruled the motion.

This Court has held in a long and unbroken line of cases beginning with *State v. Peoples,* 131 N.C. 784, 42 S.E. 814 (1902), that arbitrary exclusion of citizens from service on grand juries on account of race is a denial of due process to members of the excluded race charged with indictable offenses. The latest case is *State v. Wilson,* 262 N.C. 419, 137 S.E. 2d 109 (1964). Ordinarily it is not deemed such denial if the defendant is not a member of the excluded race. In the instant case all of the defendants are Negroes except Lowry. Though he is white, he had lived and associated with Negroes in their homes and joined with them in their marches and demonstrations. Since he made common cause with them in their demonstrations and is cast jointly with them in the trial, we think he is entitled to raise the question also.

Defendants offered evidence in support of the motion and we summarize the evidence as follows: According to the 1960 census the population of Union County is 24,467 persons over 21 years of age. Of this number 4,423 or 18% are non-white. According to the 1961 tax ledger there were 12,577 white and 2,023 non-whites assessed for taxes. Non-whites are 14% of the total. Some persons listed on the ledger are nonresidents. About 10% of those listed are women. The jury list for the county is made biennially, in odd years. A new jury list was made in June 1961. The names of all persons, regardless of race or sex, appearing on the tax ledger or scroll were put on the list. Names of females were added by taking every seventh or eighth female name, regardless of race, from voter-registration books (in 1963 all the female names in the registration books were put on the list — there had been a new registration). The list thus made was delivered to the county commissioners; they examined the list and excluded those exempt by statute; they placed an "x" beside each name to be excluded. The names approved by the county commissioners were put on separate slips of paper, one name on each slip, and these slips were placed in compartment no. 1 of the jury box. Each slip had the name, age and township of a prospective juror. If the person was colored, the designation "col." appeared after his or her name. When it was necessary to draw a venire for a term of court the names were drawn from the box by a child under 10 years of age, in the presence of the officials designated by statute, and the names were placed on a list. This constituted the jury panel for the ensuing term; the persons constituting the panel were summoned by the sheriff. At each February term or session a grand jury of 18 persons was drawn, to serve for one year. At the February terms the jury panel consisted of 48 jurors. Their names were put in a hat and 18 names were drawn from the hat by a child under 10. These constituted the grand jury. Usually 36 jurors

were drawn for regular criminal and civil terms other than the February terms; 30 for the second week of criminal terms. There was testimony that the names drawn from the jury box for jury services were placed on the jury lists regardless of race, none discarded. No copy of the original 1961 jury list, or of any lists prior thereto, was preserved. When a new list was made the slips in the box were destroyed. The grand jury which returned the indictments in the instant case was from the 1959 list. It was prepared in the same manner as was the 1961 list. From 1955 to 1958 there were no Negroes on the grand jury. From 1959 to 1962 there was one Negro on each grand jury. From November 1959 to February 1964, 706 jurors were drawn for service, and of this number 37 were Negroes. A special venire of 75 jurors was drawn in open court at the February 1964 session, for the trial of the instant case; 6 were Negroes.

Attorneys for defendants requested permission to count the names in the jury box and determine the number of whites and the number of Negroes, the sheriff to observe and assist. Upon objection by the solicitor, the request was not granted.

The judge found the following facts: The population of Union County is 83% white, 17% non-white. Three Negroes were drawn and reported for service on the panel of 48 jurors for the February Term 1961; the grand jury drawn from this panel had one Negro member — this is the grand jury that returned the bills in the case at bar. ". . . it is a general practice in Union County that the jury list carries the designation 'col.' behind the name of Negro jurors. . . . sometimes the designation 'col.' is omitted and there is no definite way to distinguish white from Negro from a study of the list." Negroes have served on the grand jury and petit jury in Union County before and subsequent to August 1961.

The court concluded that there was no evidence of systematic exclusion of qualified Negroes from jury service, defendants' constitutional rights were not abridged or violated, and the indictments are valid and proper.

We are of the opinion, and so hold, that the indictments are invalid and the court erred in denying the motion to quash.

The court found as a fact that "it is the general practice in Union County that the jury list carries the designation 'col.' behind the name of Negro jurors." It is obvious that "col." is an abbreviation of the word "colored" and is intended to designate race. This practice was in effect outlawed in *State v. Speller*, 229 N.C. 67, 47 S.E. 2d 537. In that case the names of Negroes in the jury box were printed in red, while those of whites were printed in black. When the name of a Negro was

drawn from the box it was discarded and the juror was not summoned. This Court ruled that these practices are discriminatory and arbitrary, and declared the following principle: "It has long been the holding in this jurisdiction that the law knows no distinction among those whose names are rightly in the jury box, and none should be recognized by the administrative officials. *S. v. Sloan,* 97 N.C. 499, 2 S.E. 666; *Capehart v. Stewart,* 80 N.C. 101."

Statutory provisions in this state, respecting the qualifications, selection, listing, drawing and attendance of jurors is fair and nondiscriminatory and meets all constitutional tests. *State v. Wilson, supra.* A jury list is not discriminatory merely because it is made from the tax lists. *Brown v. Allen,* 344 U.S. 443. But it is better practice to supplement such lists by resort to voter registrations and other available lists. We have no statutory requirement that the names placed in the jury box be designated according to race, and we perceive no good reason why such practice should be indulged. The reason assigned therefor in the case at bar is that many persons in Union County, white and Negro, have the same name and the racial designations make it possible to positively identify a person so that notice may be mailed to the proper individual. Jurors are usually notified of their selection by mail, and accept service by mail; if service is not thus accepted they are summoned personally. We do not consider the reason assigned for racial designations a valid one. If two white jurors have the same name, race designation would not furnish identification. The obvious solution of the identification problem would be to add the addresses where confusion might arise. Of course, the designation of race, just as sex or religious denomination, may in certain records serve a useful and necessary purpose, and the compilation of such information cannot be outlawed *per se.* But the promotion of a distinction purely on the basis of race is not justified. *Hamm v. Virginia State Board of Elections,* 230 F. Supp. 156 (ED, Va. 1964), *affd.,* 85 S. Ct. 157. It would be well for county commissioners and clerks of superior court to maintain for reference purposes statistical data with respect to the racial and sex composition of jury lists and juries which serve in the courts, so that the information may be readily available when motions such as the one under consideration are interposed. But this should not include racial designations in the jury box itself. Such practice lends itself to administrative abuses as in the *Speller* case, and casts doubt upon the administration of the jury system. As stated in *Speller:* ". . . the law knows no distinction among those whose names are rightly in the jury box."

There is in this record no direct evidence of administrative abuses or arbitrary exclusions so far as the conduct of the Union County officials is concerned. But there is a wide discrepancy in the ratio of the races in population and in jury service. Prior to 1963 there was never more than one Negro on any grand jury; during a period of 8 years, 1955 to 1962, inclusive, Negroes constituted about 5% of the petit juries. There is, of course, no requirement of law that Negro representation on jury panels be equivalent percentage-wise to population. Neither the small percentage of Negroes on the juries of Union County, nor the racial designation placed after the names of Negroes on the jury box, is conclusive proof of arbitrary and systematic exclusion of Negroes from the grand jury. But such circumstances do constitute a *prima facie* showing to that effect.

With respect to the grand jury the facts of the instant case are closely analagous to those in *State v. Wilson, supra.* There, "one Negro served on the grand jury that returned the bill of indictment in question. Another served a year earlier." Two or three Negroes served during a seven-year period. In the case at bar four of the eight grand juries, during the period 1955 to 1962, had a Negro in service. In *Wilson* we said: "When, at a hearing upon a motion to quash the bill of indictment, there is a showing that a substantial percentage of the population of the county from which the grand jury that returned the bill was drawn is of the Negro Race and that no Negroes, or only a token number, have served on the grand juries of the county over a long period of time, such showing makes out a *prima facie* case of systematic exclusion of Negroes from service on the grand jury because of race. *Arnold v. North Carolina,* 12 L. Ed. 2d 77; *Eubanks v. Louisiana,* 356 U.S. 584; *Norris v. Alabama,* 294 U.S. 587. . . . To overcome such *prima facie* case, there must be a showing by competent evidence that the institution and management of the jury system of the county is not in fact discriminatory. And if there is contradictory and conflicting evidence, the trial judge must make findings as to all material facts." Further: "The burden of proving discriminatory jury practices is upon defendant. *State v. Covington,* 258 N.C. 495, 128 S.E. 2d 822; *Miller v. State,* 237 N.C. 29, 74 S.E. 2d 513; *Akins v. Texas, supra* (325 U.S. 308). But this does not relieve the prosecuting attorney of the duty of going forward with the evidence when the defendant has made out a *prima facie* case."

In the instant case the crucial findings of fact are either indefinite or based on the absence of evidence. Defendants made out a *prima facie* case of systematic exclusion by showing the population ratio and that only a token number of Negroes had served on the grand jury, never

more than one on any grand jury, sometimes none, and that such Negroes as were approved on the biennial list were designated "col." This was enough to cast the burden on the State to go forward with the evidence and show facts with respect to the management of the jury system sufficient to clearly overcome defendants' *prima facie* showing. But the State offered no evidence except such as it could elicit on cross-examination. The sheriff and the county commissioners were best qualified to give testimony relative to the administration of the jury system, since the law places upon them the primary responsibility therefor; they were not called and did not testify. Copies of jury lists, showing the names included and those excluded, were not kept; when a new jury list was made the old one was destroyed. The judge would not permit an examination of the current jury box, or a determination of its racial composition. The court found that "there is no definite way to distinguish white from Negro from a study of the list," and "Negroes have served on the grand jury and petit jury in Union County before and subsequent to August 1961," and "there is no evidence of systematic exclusion of qualified Negroes from jury service." These findings are negative in character, or so general in nature as to be indefinite and inconclusive. They fall far short of a positive, factual showing sufficient to overcome defendants' *prima facie* evidence.

It is suggested that *State v. Perry,* 250 N.C. 119, 108 S.E. 2d 447, *cert. den.* 361 U.S. 833, 4 L. Ed. 2d 74, 80 S. Ct. 83, establishes as a matter of law that there is no systematic exclusion of Negroes from grand juries in Union County. This proposition is, of course, untenable. Each case must be decided according to the evidence adduced and the circumstances involved. There might be a different result in separate cases involving the same grand jury. Furthermore, the *Perry* case involved the 1957 grand jury, of which we have very little evidence in the instant case. Furthermore, the *Perry* case did not involve, so far as the opinion discloses, any racial designation of the names in the jury box.

Defendants made other assignments of error, but, if there were errors, they may not again arise in the event of another trial.

The indictments are quashed and the verdict and judgments are vacated for want of valid indictments to support them. It does not follow that defendants are entitled to discharge and dismissal of the charges. If the State so elects it may send new bills and if they are returned true bills by an unexceptionable grand jury, defendants may be tried thereon for the offenses alleged.

Reversed.