STATE OF NORTH CAROLINA v. JAMES C. ROBERTS

No. 85

(Filed 30 December 1974)

1. Kidnapping § 1— kidnap defined

The word "kidnap," as used in G.S. 14-39, means the unlawful taking and carrying away of a human being against his will by force or fraud or threats or intimidation.

2. Kidnapping § 1— elements of offense

To constitute the crime of kidnapping, the defendant (1) must have falsely imprisoned his victim by acquiring complete dominion and control over him for some appreciable period of time, and (2) must have carried him beyond the immediate vicinity of the place of such false imprisonment.

3. Kidnapping § 1— insufficiency of evidence

The State's evidence was insufficient to establish either the false imprisonment or the carrying away element of the felony of kidnapping where it tended to show that defendant grabbed a seven-year-old girl by the arm and pulled her a distance of 80 to 90 feet from the driveway of a nursery to steps leading into the nursery building.

4. Constitutional Law § 20; Criminal Law § 134— imprisonment for non-payment of fine — indigent defendant — equal protection

Where the trial court imposed the maximum permissible sentence of six months and the maximum permissible fine of $500 on an indigent defendant convicted of assault on a child under twelve years of age, the indigent defendant could not be imprisoned beyond the statutory maximum of six months on account of his involuntary non-

payment of the fine and court costs since such imprisonment would constitute impermissible discrimination based on ability to pay in violation of the Equal Protection Clause of the Fourteenth Amendment.

Justice LAKE concurs in result.

Justice HUSKINS dissenting in part.

Justice HIGGINS joins in the dissent.

ON *certiorari* to review the decisions of the Court of Appeals reported in 18 N.C. App. 388, 197 S.E. 2d 54 (1973), and in 22 N.C. App. 579, 207 S.E. 2d 373 (1974).

Defendant was tried at the 18 September 1972 Session of DURHAM County Superior Court on the following two-count bill of indictment, *viz:*

"THE JURORS FOR THE STATE UPON THEIR OATH PRESENT, That James Clifford Roberts late of the County of Durham on the 18th day of July, 1971, with force and arms, at and in the county aforesaid, did unlawfully, wilfully, and feloniously assault a minor child under the age of twelve years (to wit: seven (7) years of age) with the intent to rape and carnally know and abuse the said female child, Kathy Sue Cates;

"Second Count: did on the same aforesaid day and year, to wit: July 18, 1971, unlawfully, wilfully, feloniously and forcibly kidnap Kathy Sue Cates from the place and spot where she was at, against the form of the statute in such case made and provided and against the peace and dignity of the State."

Relevant events occurring prior to the 18 September 1972 Session are noted below:

On 19 July 1971, the District Court of Durham County issued a warrant charging that defendant, on 18 July 1971, assaulted Kathy Sue Cates, a child under the age of twelve years, by "grabbing her by the arm and attempting to take [her] inside a building," in violation of G.S. 14-33 (b) (5). Defendant was arrested thereon on 19 July 1971 but was released the same day after posting an appearance bond of $1,000.00. On 4 August 1971, defendant was arrested in an unrelated case in which he was charged in a three-count bill with breaking or entering, larceny, and receiving. Defendant was unable to make bond of $8,000.00 on these charges and remained in the Durham County Jail. At the 17 August 1971 Session the grand jury returned as a true bill the above-quoted indictment. On 30 August

State v. Roberts

1971, based on defendant's affidavit of indigency, the court appointed Thomas F. Loflin III, his present counsel, to represent defendant.

At the 4 October 1971 Session, defendant was tried for the offenses for which he had been arrested on 4 August 1971. He was found not guilty of breaking or entering but guilty of felonious larceny. From a judgment entered on the verdict imposing a prison sentence of six to ten years, defendant appealed. Pursuant to this judgment, defendant was committed to the State's prison on 9 October 1971. On 24 May 1972, the Court of Appeals arrested judgment in the larceny case on account of a fatal defect in the bill of indictment. 14 N.C. App. 648, 188 S.E. 2d 610 (1972). Defendant remained in custody to await trial on the indictment charging (1) an assault with intent to commit rape, and (2) kidnapping, which had been returned at the 17 August 1971 Session.

At 18 September 1972 Session, prior to the commencement of the trial, defendant moved to dismiss the charges in the quoted indictment on account of the State's failure to grant him a speedy trial thereon, the grounds therefor having been set forth in a motion he had filed on 25 August 1972. The court refused defendant's request that a hearing be conducted and findings of fact made with reference thereto and denied the motion. Defendant then pleaded not guilty to the charges and the trial of defendant thereon proceeded.

The State offered evidence which, summarized except when quoted, tends to show the following:

On Sunday, 18 July 1971, Kathy Sue Cates (Kathy), a seven-year-old girl, was living with her parents, two older sisters (Patricia and Mary Elizabeth), and an older brother (Freddy), at 611 North Hyde Park Street in Durham, N. C. A children's day care nursery was located at 605 North Hyde Park Street, on the same side of the street and two doors down from the Cates home. Behind the nursery building there was a "play area," with recreation equipment, sandbox, etc., which was completely enclosed by a low wire fence. A house at 609 North Hyde Park Street was between the Cates home and the nursery building.

On this particular Sunday afternoon the Cates family had an outdoor birthday party for one of the daughters. In addition to the members of the family, two of Kathy's friends, Sue,

age 9, and Larry, age 10, were at the Cates house during this party. Sue and Larry were visiting their aunt who lived across the street from the Cates home. Following the birthday party, Kathy and her two friends asked Mr. Cates, who had been out in the backyard making ice cream, if they could go over to the nursery and play on the swings and sliding boards. He gave them permission and they proceeded to the nursery playground.

The three children had been playing on the various playground equipment for approximately an hour when they first noticed defendant. Defendant was then standing beside an old abandoned automobile in the backyard of 609 North Hyde Park Street, on the other side of the fence enclosing the "play area" of the nursery. Prior to this time, Kathy's father had been sitting on his back doorsteps (approximately ten or twelve steps above ground level) where he could see the children playing in the nursery yard. During this time, the children and Kathy's father had been "hollering" back to one another. However, when the children first noticed defendant, Kathy's father was sitting in a chair in his backyard cutting watermelon with a large butcher knife. From this position, he could not see the nursery "play area" but could still hear the children's voices.

When the children first saw defendant, Larry (the ten-year-old boy) thought defendant was Kathy's brother Freddy and yelled out, "There is Freddy" or "Hey, Freddie." Defendant did not respond. Then Sue (the nine-year-old girl) said, "That is not Freddie." The children then kept on playing and did not pay any more attention to defendant.

Later, while the children were all playing in the sandbox, they looked up and saw defendant running toward them. At that time the children got up and began running. They did not scream. They just ran. They ran out a gate on the side of the nursery farthest from the place defendant was first observed; ran up a path outside of the fenced-in "play area"; and then ran around the front of the building to the other side where they reentered the "play area" through a little tunnel under the fence. At this point, thinking defendant had gone, the children began playing on the merry-go-round.

After a short while, the children again saw defendant. This time defendant was inside of the fenced-in "play area," standing on the patio that led to the back entrance of the nursery building. At this time the children were afraid of defend-

---

**State v. Roberts**

---

ant and started running and screaming. They ran up to and crawled through the same tunnel, which led out to the driveway of the nursery. Larry crawled through the tunnel first; then Sue; finally Kathy. The children were attempting to run to Kathy's home. Since the driveway to which the tunnel led was covered with rocks, Kathy, who was barefooted, could not run as fast as Larry and Sue and was lagging behind the other two. At this point, as the children were running on the rocky nursery yard driveway (outside of the enclosed "play area" and on the side of the nursery building closest to the Cates home), defendant "jumped out in front" of Kathy and grabbed her by the "hand." Kathy testified that "[f]rom the driveway where the nursery is located I could see the backyard of our house. I could see my daddy in the backyard. My big sister was there, too. When Mr. Roberts stepped in front of me he still didn't say anything [defendant had said nothing to any of the children prior to this time]. I said, 'What you want, man, let me go.' He said 'Shut up,' and took my hand and took me on through the gate, then through the patio, and then towards the steps." The steps referred to are located at the back of the nursery building and lead up to the back door.

During the above-described events Kathy's father was sitting in his backyard cutting watermelon. He first became aware of a possible problem when he "heard children screaming." He stated that he "heard two or three screaming to the top of their voices." Regarding his subsequent actions, he testifed as follows:

"I jumped, ran around my house, and met the other two children in the front yard, and they were screaming to the top of their voices. I didn't see my little girl, so I ran to the back of the nursery, thinking she had fallen off a swing or something. I didn't see her anywhere and glanced to my left, and saw him pulling her towards the steps.

"The 'him' I am referring to is Mr. Roberts, the defendant. I still had the knife that I was cutting the watermelon with in my hand. Mr. Roberts had Kathy Sue by her left arm, and her tugging back and he was pulling her. He was at the patio door at the bottom steps that led up to the nursery. . . . After I saw Mr. Roberts pulling on my daughter's arm, I looked, ran and grabbed him by the collar and whirled him around and stuck the knife to his throat and asked him what he was doing with my daughter. Then he let go of her. She ran home."

Mr. Cates further testified that, after letting go of Kathy Sue, the following occurred: "[Defendant] said 'Wait a minute,' and 'What are you doing' I said 'What are you doing with my daughter?' He said 'I am just taking her to show her where somebody broke in.' I said 'Well, why, do you work here?' He said 'No, I was just passing here and thought I would stop and check to see if everything was all right.' At that point my daughter went towards home."

Ben H. Hamlet, a uniformed police officer, was conducting a mobile routine patrol nearby when he received a call at about 6:15 p.m. It took him about three minutes to arrive on the scene. When he arrived, he "found the defendant and Mr. Cates standing in the backyard at the steps leading up to the rear door to the nursery, and some other people." Hamlet testified as follows: "I asked a few questions on the scene, but there were so many people beginning to gather, I ascertained the best thing to do was to clear the area before I had any more problems." Thereafter, Officer Hamlet took the defendant down to the office of Captain Seagroves at Durham police headquarters. No warrant was issued at this time and defendant was released. However, the case was held for further investigation.

Following defendant's release, Officer Hamlet went back to the nursery and discovered that the lock had been removed from the back door of the building and that the door could be easily entered. He found the lock at the bottom of the stairs, the same place where defendant had been apprehended earlier. The lock had been forcibly broken off.

On Monday, 19 July 1971, Detectives Martin and Moore of the Durham Police Department were assigned to the case. These detectives immediately went out and interviewed Kathy and her father. At the trial their testimony tended to corroborate that given by both Kathy and her father concerning the events narrated above. Detective Martin estimated that defendant "took Kathy approximately 80 to 90 feet" before Kathy's father intervened.

After these detectives terminated their investigation on 19 July 1971, they came in and told an assistant solicitor what they had discovered. He advised them to get a warrant. They procured a warrant charging defendant with the misdemeanor offense of assault on a child under the age of twelve. The above-quoted bill of indictment was returned at the 17 August 1971 Session.

Defendant did not testify or offer evidence.

In respect of the first count, the court allowed defendant's motion to dismiss as to assault with intent to commit rape and submitted this count to the jury for determination as to whether defendant was guilty or not guilty of an assault upon a child under the age of twelve years, an offense punishable as provided in G.S. 14-33 (b) (5). As to this offense, the jury returned a verdict of guilty.

In respect of the second count, the court denied defendant's motion to dismiss as in case of nonsuit and submitted this count for the jury to determine whether defendant was guilty or not guilty of kidnapping as charged. As to kidnapping, the jury returned a verdict of guilty.

Upon the verdict of guilty of kidnapping as charged in the second count, the court pronounced judgment "that the defendant be imprisoned for the term of sixty (60) years in the custody of the Commissioner of Correction."

Upon the verdict of guilty of the offense of assault upon a child under the age of twelve years, the court pronounced judgment "that the defendant be imprisoned for the term of six (6) months in the custody of the Commissioner of Correction," this sentence "to begin at the expiration of the sentence imposed on the Kidnapping count in the bill of indictment" and that defendant "pay a fine of $500.00 and cost of court" and "remain in prison until fine and costs are paid." The judgment in the kidnapping case provided that defendant "is entitled to credit on said sentence from August 17, 1971, until September 22, 1972, for time spent in custody awaiting trial."

In his first appeal to the Court of Appeals, defendant's assignments of error related to the denial of his motion to dismiss on the ground that the State had denied his constitutional right to a speedy trial and to asserted errors in the conduct of the trial at 18 September 1972 Session. The Court of Appeals found "the trial to be free from prejudicial error," but that "the trial judge committed error in failing to hear evidence and find facts upon defendant's motion to dismiss the indictment for failure to grant a speedy trial, [which] error did not affect the guilt finding process of the trial." Accordingly, the Court of Appeals did not order a new trial but remanded the case to the superior court for further hearing on defendant's motion to dismiss the indictment for failure to grant a speedy trial,

at which hearing defendant and the State would be permitted "to offer evidence upon the question of the delay between defendant's indictment and trial." The order of remand concluded as follows: "If the presiding judge determines that defendant's constitutional right to a speedy trial has been denied, he shall find the facts and enter an order vacating judgment, setting aside the verdict, and dismissing the indictment. If the presiding judge determines that defendant's constitutional right to a speedy trial has not been denied, he shall find the facts and enter an order denying the defendant's motion to dismiss, *and order commitment to issue in accordance with the judgment entered at the 18 September 1972 Session of Superior Court held in Durham County. See State v. Tart,* 199 N.C. 699, 155 S.E. 609." (Our italics.) 18 N.C. App. 388, 392-93, 197 S.E. 2d 54, 57-58. Defendant gave notice of appeal and also petitioned for *certiorari.* On 31 August 1973, this Court denied defendant's petition for *certiorari,* and, on motion of the Attorney General, dismissed defendant's appeal. 283 N.C. 758, 198 S.E. 2d 728 (1973).

At the hearing before Judge Clark at 3 December 1973 Session, evidence was offered by the State and by defendant pertinent to defendant's motion to dismiss on the ground that he had been denied his constitutional right to a speedy trial. Based upon his findings of fact, Judge Clark entered a judgment which denied defendant's motion to dismiss and further provided: "[T]hat commitment issue in accordance with the Judgment entered at the September 18, 1972, Session of this Court; and that the defendant received credit on his sentence for the period from the date of the original Judgment and Commitment, September 22, 1972, to this date; he not being entitled to any other credit on his sentence in this case for that this Court has already ORDERED that he be given credit on other sentences for the time spent in jail from the date of his original arrest and confinement, August 4, 1971."

In his second appeal to the Court of Appeals, defendant assigned as error the said judgment entered by Judge Clark at 3 December 1973 Session.

The Court of Appeals affirmed the judgment of Judge Clark subject to modification in respect of the credit to which defendant was entitled on account of pre-trial time spent in custody. Judge Clark's order was modified in this respect as follows: "The order entered on 3 December 1973, directed that commit-

ment issue in accordance with the judgment entered at the 18 September 1972 Session of that court. It then provided that he receive credit on his sentence for the period from the date of the original judgment and commitment 22 September 1972, until 3 December 1973, and no other credit. The defendant was previously sentenced and credit was given under the provisions of G.S. 15-176.2. The pre-trial custody statute in effect at the time the later order was entered was G.S. 15-196.1, effective 1 March 1973. The defendant should have been committed in accordance with the previous sentence pronounced 22 September 1972. Under its provisions, the defendant would have been given credit for all pre-trial time spent in custody from 17 August 1971, to 22 September 1972, and the judgment must be modified to this effect." 22 N.C. App. 579, 583, 207 S.E. 2d 373, 376-77.

On 21 October 1974 we allowed defendant's petition for a writ of *certiorari* to review both decisions of the Court of Appeals.

*Attorney General James H. Carson, Jr., and Associate Attorney John R. Morgan for the State.*

*Thomas F. Loflin III for defendant.*

BOBBITT, Chief Justice.

There was ample evidence to support the verdict of guilty of assault on a child under twelve years of age, which on 18 July 1971 was a misdemeanor "punishable by a fine not to exceed five hundred dollars ($500.00), imprisonment not to exceed six (6) months, or both such fine and imprisonment. . . ." G.S. 14-33(b)(5) and (c)(3). Defendant did not move to nonsuit this charge. Nor does he now contend the evidence was insufficient to support his conviction thereon. With reference to this charge, Judge Bailey instructed the jury as follows: "[I]f you find from the evidence and beyond a reasonable doubt that on or about the 18th day of July, 1971, James Clifford Roberts *intentionally and without justification or excuse grabbed Kathy Cates by the arm and pulled her any distance against her will and against her wishes,* and further find that at that time Kathy Cates had not reached her 12th birthday, and further find that at that time Clifford Roberts was a male person, it would be your duty to return a verdict of guilty of an assault on a child under the age of 12." (Our italics.)

On defendant's first appeal, the Court of Appeals affirmed Judge Bailey's denial of defendant's motion to nonsuit the kidnapping (second) count. 18 N.C. App. 388, 197 S.E. 2d 54 (1973). Because of the interlocutory aspects of that decision, defendant's application for *certiorari* for immediate review thereof was denied by this Court. 283 N.C. 758, 198 S.E. 2d 728. Whether defendant's motion should have been granted is now presented for decision.

With reference to the kidnapping (second) count, Judge Bailey charged the jury as follows: "[I]f you find from the evidence and beyond a reasonable doubt that on or about the 18th of July, 1971, James Clifford Roberts *wilfully and intentionally took Kathy Cates and carried her from a place in the driveway of this nursery to the foot of the steps leading into the nursery against her will and without lawful authority, by the use of force such as the grabbing of her arm and the forcible tugging her along,* it would be your duty to return a verdict of guilty of kidnapping." (Our italics.)

"Kidnapping" was a criminal offense at common law, a misdemeanor. By virtue of the statute now codified as G.S. 4-1, the common law with reference to kidnapping became the law of this State. There had been no statutory modification thereof prior to the effective date (14 March 1901) of Chapter 699, Public Laws of 1901. Nor does it appear that any prosecution for "kidnapping" had been reviewed by this Court.

The 1901 Act provided that "any person who shall *forcibly or fraudulently kidnap* any person shall be guilty of *a crime,* and upon conviction may be punished *in the discretion* of the court not exceeding twenty years in the State's prison." (Our italics.) When codified, the wording of the 1901 Act was modified by substituting the word "felony" for the word "crime." Revisal (1905), Sec. 3634, C.S. 1919, Sec. 4221.

"[W]hen a statute punishes an act giving it a name known to the common law, without otherwise defining it, the statute is construed according to the common-law definition." 22 C.J.S., Criminal Law § 21. Based thereon, indictments charging simply that the accused kidnapped a named person have been upheld as sufficient. *State v. Lowry,* 263 N.C. 536, 539-40, 139 S.E. 2d 870, 873 (1965). However, elements of the common law crime of kidnapping had been stated differently by well recognized commentators. *State v. Harrison,* 145 N.C. 408, 417-18, 59 S.E.

867, 870-71 (1907) ; *State v. Gough,* 257 N.C. 348, 352-53, 126 S.E. 2d 118, 121-22 (1962) ; *State v. Lowry, supra,* at 539-40, 139 S.E. 2d at 873-74; *State v. Dix,* 282 N.C. 490, 493, 193 S.E. 2d 897, 899 (1973).

Our research indicates that the first prosecution for kidnapping reviewed by this Court was *State v. Harrison, supra.* The opinion of Justice Brown quoted among others the definition of kidnapping found in 4 Blackstone's Commentaries 219, to wit: "[T]he forcible abduction or stealing away of a man, woman, or child, from their own country, and sending them into another. . . ." This Court held that kidnapping did not require (or no longer requires) that the victim be carried away from his own country to another. Harrison's conviction for kidnapping an eight-year-old neighbor boy in Currituck County was upheld. There was no evidence that the victim was ever found alive or that a body identified as that of the victim was found.

Our research indicates the only other decision of this Court which reviewed a conviction for kidnapping alleged to have been committed when our statute law consisted of the 1901 Act is *State v. Marks,* 178 N.C. 730, 101 S.E. 24 (1919). In *Marks,* the defendant was indicted for kidnapping but convicted of an assault on a woman. In upholding the verdict and judgment, Chief Justice Clark, for the Court, noted that the evidence justified the action of the trial judge in submitting the kidnapping charge to the jury.

Our present statute was enacted as Chapter 542, Public Laws of 1933. It became effective 15 May 1933 and is now codified as G.S. 14-39. It superseded the 1901 Act.

The 1933 Act, in pertinent part, provided that "[i]t shall be unlawful for any person . . . to kidnap . . . any human being, or to demand a ransom of any person . . . to be paid on account of kidnapping, or to hold any human being for ransom . . . ."; and that any person convicted of a violation of the statute *"shall be punishable by imprisonment for life."* (Our italics.)

Seemingly, the Lindbergh tragedy prompted the enactment of the 1933 Act. As interpreted by this Court, the 1933 Act leaves the term of imprisonment in the discretion of the court, imprisonment for life being the maximum punishment. *State v. Kelly,* 206 N.C. 660, 663, 175 S.E. 294, 296 (1934) ; *State v.*

*Lowry, supra,* at 541, 139 S.E. 2d at 874; *State v. Bruce,* 268 N.C. 174, 184, 150 S.E. 2d 216, 224 (1966).

In *State v. Smith,* 210 N.C. 63, 185 S.E. 460 (1936), the conviction of defendants for kidnapping was reversed although the convictions for conspiracy to assault and simple assault were upheld. [Note: The record in *Smith* discloses a factual situation similar in many respects to that involved in such later cases as *State v. Gough,* 257 N.C. 348, 126 S.E. 2d 118 (1962); and *State v. Murphy,* 280 N.C. 1, 184 S.E. 2d 845 (1971).]

Subsequent cases involving diverse factual situations in which convictions for kidnapping have been upheld include the following: *State v. Kelly, supra; State v. Witherington,* 226 N.C. 211, 37 S.E. 2d 497 (1946); *State v. Streeton,* 231 N.C. 301, 56 S.E. 2d 649 (1949); *State v. Dorsett,* 245 N.C. 47, 95 S.E. 2d 90 (1956); *State v. Gough, supra; State v. Lowry, supra; State v. Bruce, supra; State v. Turner,* 268 N.C. 225, 150 S.E. 2d 406 (1966); *State v. Arsad,* 269 N.C. 184, 152 S.E. 2d 99 (1967); *State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481 (1969); *State v. Perry,* 275 N.C. 565, 169 S.E. 2d 839 (1969); *State v. Woody,* 277 N.C. 646, 178 S.E. 2d 407 (1971); *State v. Penley,* 277 N.C. 704, 178 S.E. 2d 490 (1971); *State v. Ingland,* 278 N.C. 42, 178 S.E. 2d 577 (1971); *State v. Barbour,* 278 N.C. 449, 180 S.E. 2d 115 (1971); *State v. Maynor,* 278 N.C. 697, 180 S.E. 2d 856 (1971); *State v. High,* 279 N.C. 487, 183 S.E. 2d 633 (1971); *State v. Murphy, supra.*

No attempt will be made to reconcile all cited cases. Suffice to say, no single common-law definition seems sufficient to cover all of the factual situations in the cases in which convictions have been upheld. In general, it appears that, subsequent to the increase in maximum punishment authorized by the 1933 Act, our decisions have tended to relax the common-law requirements for conviction of kidnapping, at least until the decision of this Court in *State v. Dix,* 282 N.C. 490, 193 S.E. 2d 897 (1973).

In *State v. Ingland, supra,* a new trial was awarded on account of error in the court's instructions to the jury. *Inter alia,* this Court held that the unlawful seizure and detention of a human being *for the purpose* of unlawfully taking and carrying him away against his will by force or fraud or intimidation was false imprisonment but not kidnapping. In so holding, the Court, in an opinion by Justice Huskins, withdrew as un-

authoritative contrary expressions in prior opinions. It was stated, "[C]ommon-law kidnapping contemplates, in addition to unlawful restraint, a carrying away of the person detained. *State v. Harrison,* 145 N.C. 408, 59 S.E. 867 (1907), quotes Bishop's definition of kidnapping as " 'false imprisonment aggravated by conveying the imprisoned person to some other place.' " See 2 Bishop, Criminal Law § 750 (9th ed. 1923). For a discussion of the elements of the common law crime of false imprisonment, see *State v. Ingland, supra,* at 51, 178 S.E. 2d at 582-83.

[1]    As held in *Ingland,* the word KIDNAP, as used in G.S. 14-39, means the unlawful taking and carrying away of a human being against his will by force or fraud or threats or intimidation. In the present case, the questions are whether the evidence was sufficient to show (1) that defendant falsely imprisoned Kathy, and (2) that he unlawfully carried her away by force, in such manner as to constitute the felony of kidnapping.

[2, 3]    No attempt will be made to mark out the limits of what constitutes a false imprisonment or a carrying away sufficient to satisfy these elements in the crime of kidnapping. Here, the entire incident occurred during the seconds it took defendant to pull Kathy a distance of 80 to 90 feet, at a time when Larry and Sue were screaming and running for readily available help and Kathy was resisting by word and by deed defendant's efforts to make her go along with him. To constitute the crime of kidnapping the defendant (1) must have falsely imprisoned his victim by acquiring complete dominion and control over him for some appreciable period of time, and (2) must have carried him beyond the immediate vicinity of the place of such false imprisonment. We hold the evidence, when considered in the light most favorable to the State, insufficient to establish either the false imprisonment or the carrying away element of the felony of kidnapping.

The only requirement for a conviction of kidnapping under the instructions given the jury was that the State satisfy the jury from the evidence beyond a reasonable doubt that defendant "wilfully and intentionally took Kathy Cates and carried her from a place in the driveway of this nursery to the foot of the steps leading into the nursery against her will and without lawful authority, by the use of force such as the grabbing of her arm and the forcible tugging her along." These facts alone are insufficient to constitute the felony of kidnapping. Yet they

were the facts in evidence upon which the court had to base his instructions.

We note that the trial judge dismissed the charge of assault with intent to commit rape. We further note there is no evidence that defendant subdued Kathy by the use or threatened use of a deadly weapon. Nor is there any evidence that he struck her or attempted to abuse or fondle her. Nothing in the evidence suggests that defendant intended to grab Kathy rather than Larry or Sue. Although the State suggests defendant had broken the lock to the back door to the nursery, there is no evidence as to when or by whom the lock was broken. The fact that the lock had been broken off and was found at the foot of the stairs when Officer Hamlet returned to the scene an hour or more after he had taken defendant to the office of Captain Seagroves falls far short of establishing that defendant had broken the lock.

With reference to the kidnapping (second) count in the bill of indictment, the conclusion reached is that defendant's motion for judgment of nonsuit should have been granted. Hence, as to the kidnapping charge, the decision of the Court of Appeals is reversed.

The conduct of defendant cannot be condoned. An unlawful and unexplained assault by an adult male upon a seven-year-old girl must be regarded as base and contemptible. Yet, since Kathy was rescued immediately, unharmed, the offense under consideration cannot be considered the sort of conduct for which life imprisonment is permissible and for which a sentence of imprisonment for sixty years was actually imposed.

With reference to the first count, the judgment pronounced by the trial judge imposed the maximum sentence for an assault upon a child under the age of twelve years committed on 18 December 1971. We note that G.S. 14-33 (b) (5) and (c) (3) as amended now provide as punishment for this offense "a fine, imprisonment for not more than two years, or both fine and imprisonment." G.S. 1B, Replacement 1969, 1973 Cumulative Supplement.

We find no error in the trial with reference to the charge of an assault upon a child under the age of twelve years. Nor do we find error in the denial by Judge Clark of defendant's motion to dismiss for alleged denial of his constitutional right to a speedy trial. There remains for consideration the status of the

judgment pronounced upon defendant's conviction of assault on a child under the age of twelve years.

In respect of pre-trial time spent in custody, and in conformity with the credit Judge Bailey had allowed in the judgment entered at 18 September 1972 Session, the Court of Appeals extended the credit provided for in Judge Clark's order of 3 December 1973 as set out above. However, we note the credit allowed by Judge Clark as well as the extended credit allowed by the Court of Appeals exceeds the period of six months for which defendant was sentenced upon conviction of assault upon a child under the age of twelve years.

In the judgment pronounced at 18 September 1972 Session for assault on a child under twelve years of age, Judge Bailey imposed the maximum permissible sentence of six months and the maximum permissible fine of $500. Defendant's indigency had been established on 30 August 1971.

In *Williams v. Illinois,* 399 U.S. 235, 26 L.Ed. 2d 586, 90 S.Ct. 2018 (1970), involving an indigent defendant, an Illinois court had imposed the maximum statutory prison sentence and in addition had ordered the payment of a fine and costs. The Supreme Court of the United States held that "the Equal Protection Clause of the Fourteenth Amendment requires that the statutory ceiling placed on imprisonment for any susbtantive offense be the same for all defendants irrespective of their economic status." *Id.* at 244, 26 L.Ed. 2d at 594, 90 S.Ct. at 2023-24. The following excerpts from the opinion of Chief Justice Burger indicate the precise limits of the decision: "[W]hen the aggregate imprisonment exceeds the maximum period fixed by the statute and results directly from an involuntary nonpayment of a fine or court costs we are confronted with an impermissible discrimination that rests on ability to pay. . . ." *Id.* at 240-41, 26 L.Ed. 2d at 592-93, 90 S.Ct. at 2022. Again: "Since only a convicted person with access to funds can avoid the increased imprisonment, the Illinois statute in operative effect exposes only indigents to the risk of imprisonment beyond the statutory maximum. By making the maximum confinement contingent upon one's ability to pay, the State has visited different consequences on two categories of persons since the result is to make incarceration in excess of the statutory maximum applicable only to those without the requisite resources to satisfy the money portion of the judgment." *Id.* at 242, 26 L.Ed. 2d at 593-94, 90 S.Ct. at 2023.

[4]   On authority of *Williams v. Illinois, supra,* we hold that the present indigent defendant may not be imprisoned further on account of his failure to pay the fine and costs. See also, *Tate v. Short,* 401 U.S. 395, 28 L.Ed. 2d 130, 91 S.Ct. 668 (1971) ; *Annot.,* Indigency of Offender As Affecting Validity of Imprisonment As Alternative to Payment of Fine, 31 A.L.R. 3rd 926 (1970), and supplemental decisions.

With reference to kidnapping, the decision of the Court of Appeals finding no error in the trial and affirming the judgment is reversed.

As to assault on a child under the age of twelve years, the defendant, being entitled to credit for pre-trial time spent in custody in excess of the valid sentence of six months, is entitled to his discharge from imprisonment with reference to that offense.

Accordingly, the defendant is entitled to be discharged forthwith upon a determination that there are no other criminal charges pending against him.

As to kidnapping: Reversed.

As to assault: No error in the trial and sentence of six months, but defendant entitled to discharge from further imprisonment on account of credit for pre-trial time spent in custody in excess of six months.

Justice LAKE concurs in result.

Justice HUSKINS dissenting in part.

The word "kidnapping," as used in G.S. 14-39, means the unlawful taking and carrying away of a human being against his will by force or fraud or threats or intimidation. *State v. Bruce,* 268 N.C. 174, 150 S.E. 2d 216 (1966) ; *State v. Lowry,* 263 N.C. 536, 139 S.E. 2d 870 (1965) ; *State v. Gough,* 257 N.C. 348, 126 S.E. 2d 118 (1962) ; G.S. 4-1. This definition of kidnapping was generally understood prior to decision of this Court in *State v. Dix,* 282 N.C. 490, 193 S.E. 2d 897 (1973).

The *Dix* decision holds that there was not a sufficient "asportation" or "carrying away" to constitute the offense of kidnapping where defendant forced a jailer at gun point to go from the front door of the jail to the jail cells, a distance of

State v. Roberts

about 62 feet, where he compelled the jailer to release three prisoners and then locked the jailer in a cell. Prior to *Dix* the distance the victim was "carried away" was immaterial. The controlling factor was whether the victim *in fact* was unlawfully taken and carried away by force or fraud or threats or intimidation. Under *Dix*, the distance seems to be the controlling factor with consideration given to whether the asportation was "merely technical" or whether the victim was removed from one "enviroment" to another. We said in our dissent to *Dix* that the majority opinion waters down the law "and creates uncertainties of unknown dimensions." The soundness of that observation is demonstrated by the majority opinion here.

Here, it is perfectly apparent that defendant went to the playground to assault and molest the children who were playing there. When they attempted to run away, defendant jumped in front of Kathy, a seven-year-old girl, and grabbed her. When she told him to let her go, defendant said "shut up" and dragged her, screaming and protesting, a distance of 80 to 90 feet to the back door of a building, the lock to which had been forcibly broken off. When Kathy's father overtook him there in response to the screams of the children and demanded to know what he was doing with Kathy, defendant said, "I am just taking her to show her where somebody broke in." The broken lock from the door was found at the same place where defendant was apprehended by Kathy's father. The only legitimate, logical inference to be drawn from these facts is that defendant knew the lock was broken (whether he did it or not) and was dragging the child into the building to assault her. The majority now decides that Kathy was neither falsely imprisoned nor kidnapped because "the entire incident occurred during the seconds it took defendant to pull Kathy a distance of 80 to 90 feet, at a time when Larry and Sue were screaming and running for readily available help and Kathy was resisting by word and by deed defendant's efforts to make her go along with him. To constitute the crime of kidnapping the defendant (1) must have falsely imprisoned his victim by acquiring complete dominion and control over him for some appreciable period of time, and (2) must have carried him beyond the immediate vicinity of the place of such false imprisonment. We hold the evidence, when considered in the light most favorable to the State, insufficient to establish either the false imprisonment or the carrying away element of the felony of kidnapping." Thus, in *Dix* the victim was carried 62 feet but he was not "carried away

---

Insurance Co. v. Tire Co.

---

enough" to constitute kidnapping. Here, the victim was dragged 80 to 90 feet but the majority holds she was not "carried away enough." Moreover, additional requisites are now prescribed. Unless the accused (1) acquires *complete dominion and control* over his victim (2) for some *appreciable period* of time, and (3) carries the victim beyond *the immediate vicinity* of the place where he acquired complete dominion and control, he is not guilty of kidnapping. Our next duty, in cases to come, will require us to define the meaning of "complete dominion and control," "appreciable period of time," and "immediate vicinity." Those definitions will only dig up more snakes.

Established law is always left more indefinite, more uncertain, and more unenforceable when courts begin to tamper with it. Such is the case here. The majority decision is the first offspring of *Dix.* There will be others; and the law of kidnapping will become, if in fact it has not already, a jumble which officers and prosecutors can neither understand nor enforce. Meter sticks and measuring tapes are strange but necessary aids in determining whether a kidnapping has been committed. Perhaps divining rods are next.

For the reasons stated here and in my dissent in *State v. Dix,* I respectfully dissent from that part of the majority opinion which holds that the evidence is insufficient to establish either false imprisonment or kidnapping. See *State v. Ingland,* 278 N.C. 42, 178 S.E. 2d 577 (1971), where those two crimes are defined and distinguished, each from the other.

Justice HIGGINS joins in this dissent.